EPLETVEIT, ET AL., RESPONDENTS, *v.* SOLBERG, APPELLANT.
No. 8631
Submitted April 9, 1946. Decided June 4, 1946.
169 Pac. (2d) 722

Mr. Lloyd A. Murrils, of Cut Bank, for appellant.

Mr. D. W. Doyle, of Conrad, for respondents.

MR. JUSTICE ADAIR delivered the opinion of the Court.

Toole County, Montana, acquired tax title to an unoccupied, unfenced quarter section of wild grazing land situate about 10½ miles north of Shelby, described as the northwest quarter of section 3 in township 33 north of range 2 west of the Montana principal meridian.

In 1940 the county conveyed the land to Victor Lundin and Gunder Epletveit. Epletveit, a bachelor, resided and made his

home with Lundin at the latter's ranch located 8 miles north and 2 miles west of Shelby.

Shortly after acquiring the land Lundin and Epletveit orally agreed with William Flesch that for a rental of $10 per year Flesch could graze his livestock on the land with the verbal understanding that "he could have the grass on it as long as it was not sold" and that he could remove any fence built by him thereon. Flesch testified: "I was to go ahead and build a fence on there anytime I wanted to, * * *. I could remove the fence, I was to pay him Ten Dollars a year for the use of the ground." Pursuant to such oral agreement Flesch used the land during the years 1940, 1941 and 1942 for grazing purposes paying therefor, each year, to Victor Lundin the $10 rental and Lundin paying the taxes on the property.

Flesch resides on a ranch located about 8 miles north of Shelby, his house and farm buildings being located about one and one-half miles south of the above-described quarter section, the west line of which borders on the Shelby-Sweetgrass highway. To keep his livestock from wandering on this highway Flesch built a fence on the west property line of the quarter section extending from his own fence on the south to the fence of Martin S. Solberg on the north with which it was connected. There was no fence on the remaining sides of the quarter. Except for this west line fence so built pursuant to the oral agreement giving him the right to remove same on the sale of the land, Flesch placed no improvements on the land which he used only for grazing purposes.

Martin S. Solberg resides on a ranch located about 12 miles north of Shelby, his house being about a mile and a quarter north of the north line of the described quarter section.

In September 1943, Gunder Epletveit offered to sell the quarter section to Martin S. Solberg for the price of $2 per acre. Solberg accepted the offer stating to Epletveit that he desired the contract made at once as he intended to use the land for farming purposes and wanted to get it plowed.

Four days later, September 18, 1943, Epletveit and Solberg, accompanied by Victor Lundin, met in the law office of G. C. Hoyt, an attorney at law, in Shelby, for the purpose of having reduced to writing their agreement for the sale and purchase of the land where, to evidence such agreement, attorney Hoyt prepared and Epletveit executed and delivered to Solberg the following written instrument, viz.:

"Receipt for Payment on Land

"I, the undersigned, Gunder Epletveit, do hereby acknowledge receipt of the sum of one dollar ($1.00) paid to me by Martin S. Solberg, it being understood and agreed that I will sell to him the following described land in Toole County, Montana, at and for the sum of three hundred twenty dollars ($320.00) when the title to said land has been quieted thru court proceedings, or otherwise, reserving thereout and therefrom unto myself all of the oil, gas and other minerals in and under said land. The balance of $319.00 to be paid to me immediately upon my executing and delivering to said Martin S. Solberg a deed to said land.

"The land above referred to is described as Lots 3 and 4 and the South Half of the Northwest Quarter of Section 3 in Township 33 North, Range 2 West, M. P. M.

"Dated at Shelby, Montana, this 18th day of September, 1942.

"Gunder Epletveit".

Following the making of the contract Solberg deposited in the bank at Shelby the money to become due and payable under the agreement with Epletveit "when the title to said land has been quieted."

In the fall of 1943, subsequent to the making of the contract of sale and purchase, Flesch tendered to Victor Lundin the sum of $10 for the use of the pasture on the quarter section for another year but Lundin declined to accept the money informing Flesch that the land had been sold. Flesch testified: "I gave Lundin another ten dollars * * * right after Solberg should

have bought this ground. That was the first I found out about it, it was supposed to have been sold, so Vic [Lundin] said he couldn't take the money because Solberg bought the land."

Following the delivery to him of the writing executed by Epletveit on September 18, 1943, Solberg entered upon and commenced improving the property. In the fall of 1943 he set the corner posts and commenced digging post holes for a fence to enclose the land completing such fence in 1944.

There is evidence that Flesch's "cows got in there once" and that Solberg told Flesch's hired man to tell his employer "to keep his cows out of there or I would disconnect his fence.

In the spring of 1944 Solberg laid out and commenced to break 70 acres of the land using a tractor and set of mold board plows. He started plowing after a rain and when the ground became dry he stopped until another rain when he would plow again. Thus he was delayed several times in his breaking operations because of dry weather. The plowing was tough —at times his tractor would pull five plows and at other times it could pull but three so that Solberg was only able to plow about five to ten acres in a day. By double discing and double springing the land he thoroughly worked and prepared it for the planting of the 1945 crop.

Lundin testified that from the vicinity of the Flesch residence a person should be able to see a man working upon the land involved in this action, and Flesch testified that by going about forty rods from his house, "I could see all over that whole spread."

On June 30, 1944, the day Solberg completed the breaking and plowing of the 70 acres, he received a letter bearing that date, addressed to him and signed by William Flesch, which stated:

"In re: NW¼ of Section 3 in Township 33 North of Range Two West.

"This is to notify you that I, William Flesch, the undersigned, have a written Farm and Grazing Lease on the above land, duly signed by Mr. Gunder Apletunt dated March 1,

1942, and said lease continues for a period of eight years from that date.

"You are further notified that this Lease is still in good standing and in full force and effect and that you are not to do any further work plowing or anything else on said land unless you have had an agreement with me accordingly."

On June 29, 1944, being the day previous to the receipt of the above letter, an employee of Flesch notified Solberg who was then plowing on the land to discontinue his operations as Flesch had the land leased, informing Solberg that the next day he "was going to get a letter from Bill Flesch." This oral statement made to him by Flesch's cook over nine months after entering into the contract of sale and purchase with Epletveit was the first notice or knowledge had by Solberg that Flesch was claiming to have a lease on the quarter section.

On June 10, 1944, being long after the execution of the contract of sale and purchase and but 20 days before Solberg completed plowing the 70 acres, an unacknowledged lease agreement was filed and recorded in the office of the county clerk and recorder of Toole County reading as follows, viz.:

"This agreement, made this 1st day of March, 1942, by and between Gunder Epletuent, party of the first part, and Wm. Fleisch, party of the second part;

"That, for and in consideration of the sum of $10.00 per annum, payable annually, party of the first part agrees to lease and by these presents, does lease, to the party of the second part certain lands in the County of Toole and State of Montana, described as follows:

"The NW¼ of Section three (3) Township Thirty three (33) Range two (2) west

for a term of eight years from the date aforesaid and the party of the first part acknowledges receipt of the first year's rental, subsequent rentals to be paid on or before the date before set forth.

"That, it is understood by and between the parties that said land is to be used for grazing purposes solely and that, in case

any of said land is used for agricultural purposes, rental is to be taken under consideration as to the value of crop raised thereon.

"That, in case of sale, said land is to be sold subject to said agreement.

"That, said party guarantees that he has full right and title to make this lease and warrants that he will defend any adverse claimant.

"That, in case party of the second part builds any fences or puts on any *buildings* on said land, that he has the right to remove same in case *on* sale subject to this lease.

"That, this is a *continuing* lease and subject to renewal after the lapse of eight years upon agreement of the parties hereto.

"Witnesses.

"H. R. Schlytter   Gunder Epletveit

              Party of the first part

"H. R. Schlytter   Wm. Flesch,

              Party of the second part

        "163097

         "Booked GB

         "Indexed M. N.

         "Compared GB EC"

At the time of entering into the contract of sale and purchase the quarter section was unoccupied, uncultivated grazing land wholly unfenced except along the side bordering the Shelby-Sweetgrass highway. Before making his deal to purchase the property Solberg searched the records of Toole County for instruments affecting the title or right to the possession of the land and he found no lease of record. Concerning the making of the contract in attorney Hoyt's office on September 18, 1943, Solberg testified: "You see it was a tax title, and there were lots of heirs, and they had oil and gas rights there; of course we know that we had to clear up the title. * * * If I got the right title I figured that the surface would be all right, the title, there was nothing to interfere because they had already

started to clear the title. That is the reason that Lundin and Epletveit were both there, I know they both bought that together. I wouldn't deal with one except the other one would know exactly what was going on. * * * Lundin explained this, that fence belonged to Bill Flesch. The agreement was when Gunder [Epletveit] sells that land, anytime he sells that land, Bill will have the right to move that fence. I said, that is oke with me.''

Lundin knew nothing about the purported written lease from Epletveit to Flesch, being plaintiff's exhibit 1. He testified:

''Q. At the times that Flesch paid the rental to you up to 1942, at those times did you know anything about exhibit 1? A. No. I did not.

''Q. In the fall of 1943 when he offered to pay you rent and you refused it, did you know anything about it then? A. No, I did not.''

At no time prior to or during the time he was making his deal with Solberg did Epletveit disclose that he, Epletveit, had theretofore given a written lease on the land and he permitted Solberg to enter into the agreement in complete ignorance and without any notice or knowledge of the existence of the purported written lease to Flesch.

On July 24, 1944, the plaintiffs, Gunder Epletveit and William Flesch, commenced this suit *in equity* against the defendant Martin S. Solberg to have determined and adjudged the right to the possession of the quarter section of land involved.

A trial was had before the court without a jury. Findings and conclusions were made and decree entered adjudging that by virtue of the instrument dated March 1, 1942, Epletveit had leased and let the lands to the plaintiff William Flesch for a period of eight years and that Flesch ''was at the time of the commencement of the above entitled atcion and now is entitled to the immediate and exclusive possession of said lands * * * and that the defendant is hereby estopped and enjoined from setting up any claim to said premises, adverse to the claim of the plaintiff William Flesch, or interfering with the

possession of the plaintiff William Flesch." From such decree the defendant Martin Solberg has appealed to this court.

The complaint alleges that the defendant Solberg claims some right, title, interest or estate in the lands, adverse to plaintiff's ownership and right to the possession thereof, but plaintiffs allege that "the defendant has no right, title or interest in and to the lands or to the possession thereof, *except they contract to purchase said lands under certain conditions and terms,* subject to the rights of the plaintiff, William Flesch." (Emphasis ours.)

The defendant Solberg does not claim adversely to Epletveit but he claims by, through and from Epletveit. Solberg bases his claim of interest in the property upon the contract of sale and purchase voluntarily executed and given, for a valuable consideration, by Epletveit whereby Solberg acquired the equitable title and ownership of the land without notice or knowledge of any outstanding lease to Flesch.

In Kern et al. v. Robertson, 92 Mont. 283, 288, 12 Pac. (2d) 565, 567, this court said:

"The authorities are in accord that an enforceable contract for the purchase and sale of real property passes to the purchaser the equitable and beneficial ownership thereof, leaving only the naked legal title in the seller, as trustee for the purchaser, and as security for the unpaid purchase price. * * *

" 'Applying one of its fruitful principles, that what ought to be done is regarded as done, equity says that from the contract, even while yet executory, the vendee acquires a "real" right, a right of property in the land, which though lacking legal title, and therefore equitable only, is none the less the real, beneficial ownership, subject, however, to a lien of the vendor as security for the purchase price as long as that remains unpaid. * * * In short, equity regards the two contracting parties as having changed positions, and the original estate of each as having been "converted," that of the vendee from personal into real property, and that of the vendor from real into personal property.' 1 Pomeroy Eq. Jur. (4th Ed.) sec.

105, pp. 117, 118.'' (Citing numerous other authorities.) See also to same effect, 2 Pomeroy's Equity Jur., 5th Ed., sections 368, 372, pp. 21, 33.

The plaintiff Epletveit has no occasion to petition a court of equity to remove a cloud on title which he freely and voluntarily placed there by giving to Solberg a contract for the purchase and sale of the land whereby he obligated himself to quiet the title and thereupon to execute and deliver a deed conveying the property to Solberg. Equity does not relieve where the primary right of a party is legal in its nature as distinguished from equitable and one for which there is an adequate remedy at law. 10 Cal. Jur. 463, 464; Philbrick v. Amerian Bank & Trust Co., 58 Mont. 376, 387, 193 Pac. 59; Meyer v. Lemley, 86 Mont. 83, 92, 282 Pac. 268.

A cloud on title which requires the intervention of a court of equity to remove is one which the complainant has not created and placed himself under personal obligation to remove. As is said in Combs v. Combs, 249 Ky. 155, 60 S. W. (2d) 368, 369, 89 A. L. R. 1095, 1097: ''But in this case the alleged cloud on defendant's title to his Arkansas land was and is only an incumbrance voluntarily put upon the title by himself to secure an obligation that he agreed to pay plaintiffs, and was not a threatened danger emanating from an outstanding adverse claim or title to his land. The alleged cloud in this case was not only of the nature indicated, but it was an invited one and amicable to defendant's title, and one which he agreed to and could remove, having created it by like voluntary action in creating his debt to plaintiff. A cloud such as requires the intervention of a court to remove, would seem to be one that the applicant for its removal had neither created nor was he under any personal obligation to discharge or remove; and for which reason, we repeat, that it is even doubtful if the Arkansas court had jurisdiction to relieve the land in that state from the lien that defendant had put upon it.''

While the unacknowledged, unrecorded lease is valid as between Epletveit and Flesch (Sec. 6938, Revised Codes), it

is not binding on the defendant Solberg who is not a party to the lease and who had no notice thereof at the time Epletveit contracted to sell him the land and who promptly entered into possession of the land and made improvements thereon, including the plowing of almost 70 acres thereof, with neither notice nor knowledge of any undisclosed, unacknowledged, unrecorded lease thereon.

Nothing was accomplished by the attempt made on June 10, 1944 to record the lease. The attempted recording occurred almost nine months after Epletveit and Solberg made their contract of sale and purchase. The lease was not acknowledged or proved as required by statute hence it was not entitled to be recorded and it imparts no constructive notice whatever to any one. Section 6893, Revised Codes; Baum v. Northern Pac. Ry. Co., 55 Mont. 219, 222, 175 Pac. 872. For the record of an instrument to impart constructive notice, the writing must be one which the law authorized to be recorded (Lee v. Laughery, 55 Mont. 238, 244, 175 Pac. 873) and not one that is illegally placed of record in violation of the express mandate of the statute (Sec. 6893, Revised Codes).

While the record fails to disclose when or how Victor Lundin parted with his interest in the property, yet for the purposes here it is conceded by all the parties to this suit that the legal title to the land involved is in the plaintiff Gunder Epletveit. The equitable title to the land is in the defendant Martin S. Solberg by virtue of the contract of sale and purchase given him by the legal owner Epletveit. The right to the immediate possession and use of the surface of the land is claimed by both the defendant Solberg and the plaintiff Flesch.

The defendant Solberg bases his claimed right to possession upon the contract of sale given him by the plaintiff Epletveit followed by taking and remaining in actual possession and placing valuable improvements thereon.

The plaintiff Flesch grounds his claimed right to the possession upon the written lease given him by his coplaintiff Epletveit.

Thus do both the defendant Solberg and the plaintiff Flesch claim by and through contracts given them by Epletveit who holds the legal title to the quarter section.

Defendant contends that the writing purporting to be a lease from the plaintiff Epletveit to his coplaintiff Flesch was not in existence on September 18, 1943, when Epletveit, Lundin and Solberg met in attorney Hoyt's office where Epletveit subscribed and delivered to Solberg the written note or memorandum of the contract for the sale of the quarter section thereby complying with the statute of frauds, section 7519, subd. 5, Revised Codes. Defendant contends that while the purported lease recites that it was made March 1, 1942, it actually was neither prepared nor signed by the plaintiffs until about June 1944, when the attempt was made to record the document being but a few weeks prior to the commencement of this suit. If the purported written lease was not in existence in September 1943 when Epletveit made and delivered to Solberg the contract of sale, then, as to defendant Solberg, it is fraudulent. On the other hand if the purported lease was in existence in September 1943 when the contract of sale was made, then it became and was Epletveit's duty to speak concerning same and reveal its existence. He should have informed Solberg and attorney Hoyt that he had already given an eight-year grazing lease on the property and that by reason thereof the purchaser Solberg would be denied the possession and enjoyment of the property and that, even though he contracted to buy the property, Solberg would not be able to carry out his expressed intention of plowing and farming the land.

In the written memorandum which he executed and delivered to Solberg the plaintiff Epletveit carefully reserved "thereout and therefrom unto myself all the oil, gas and other minerals in and under said land." Had Epletveit disclosed to the attorney drafting the above quoted reservation that he had already given an eight-year lease on the property which was then outstanding, then the attorney could have incorporated in the instrument he was called upon to prepare a further clause

reserving until March 1, 1950, thereout and therefrom unto his coplaintiff Flesch all the grass, pasture and surface rights in and upon said land. Epletveit remained silent when it was his duty to speak. He failed to inform Solberg with whom he was contracting or the attorney whose services were enlisted to draft the memorandum or his associate Lundin of the existence of the purported written lease to Flesch and thereafter he stood silently by while Solberg entered into possession and made valuable improvements on the land. Even though the entire agreement rested on parol with no written memorandum to support it, nevertheless equity would intervene to prevent plaintiffs claiming the benefits resulting from Solberg's possession, industry and improvements for the authorities are practically all agreed that if possession taken in pursuance of the contract is followed by the making of valuable improvements on the land by the vendee there is sufficient part performance to remove the contract from the operation of the statute of frauds, the rule being as stated in Hogan v. Thrasher, 72 Mont. 318, 328, 233 Pac. 607, 611, wherein this court said: "In 27 C. J. 343, the rule applicable under this statute is stated as follows: 'Where one party, to an oral contract has, in reliance thereon, so far performed his part of the agreement that it would be perpetrating a fraud upon him to allow the other party to repudiate the contract and to set up the statute of frauds in justification thereof, equity will regard the case as being removed from the operation of the statute and will enforce the contract by decreeing specific performance of it, or by granting other appropriate relief.' "

The plaintiff Flesch admits that in the fall of 1943 he was informed of the sale of the land to Solberg "right after Solberg should have bought this ground" at which time and because of the sale Lundin refused to accept from Flesch the rent money tendered for the use of the pasture on the land for another year. If at that time Flesch had a written lease on the land he should have informed Lundin of such fact and he should have promptly asserted his rights thereunder as against both Solberg,

the purchaser, and Epletveit, the seller, but this he did not do. Instead he stood silently by while Solberg took possession, built fences and plowed and prepared the land for the planting of crops without making any move to inform Solberg of the existence of the purported lease and without asserting any rights thereunder until the 29th or 30th of June 1944 when the plowing was completed.

This suit was commenced by the plaintiffs Epletveit and ▮ Flesch in a court of *equity* for the purpose of obtaining *equitable* relief. Any one appealing to the equitable jurisdiction and asking the aid of a court of equity whether that aid is such as could be obtained in a court of law or whether it is of a character obtainable only in a court of equity, submits himself to the jurisdiction of the court and, in asking its aid, subjects himself to the imposition of such terms as well-established equitable principles would require. Charleston & W. C. R. Co. v. Hughes, 105 Ga. 1, 30 S. E. 972, 70 Am. St. Rep. 17; Russell Petroleum Co. v. Walker, 162 Okl. 216, 19 Pac. (2d) 582.

For the government and regulation of their action, courts of equity have formulated certain rules or principles termed maxims among which are: "He who seeks equity must do equity"; and "He who comes into equity must come with clean hands."

Applying these equitable principles here it is clear that the ▮ plaintiffs Epletveit and Flesch may not invoke the jurisdiction of a court of equity to perpetrate a fraud upon their neighbor Solberg nor to deprive him of the fruits of his labor and industry in plowing, preparing and improving the land for which Epletveit had obligated himself to deliver a deed of conveyance. Solberg had deposited in the bank the balance of the agreed purchase price awaiting the time when the plaintiff Epletveit shall have performed his contract to quiet the title. Nothing further remained to be done by Solberg. The contract for the sale of the land being legal and Epletveit, having accepted and acknowledged receipt of a valuable consider-

ation therefor, was in duty bound to perform. Equity imputes an intention to fulfill an obligation. 2 Pomeroy's Equity Jur., 5th Ed., sec. 420, p. 182. Epletveit has made no move to quiet the title as to the former owners, their heirs and successors in interest. It would have been a simple matter in instituting his present action for Epletveit to have named as parties defendant the former owners and their successors but this he did not do. Equity will not allow the plaintiff Epletveit to repudiate his contract with defendant Solberg nor will it permit his co-plaintiff Flesch to stand by from September 1943 to June 30, 1944 with the purported written lease concealed in his pocket while Solberg, in complete ignorance of such document or of Flesch's claimed rights thereunder, takes possession of the land under his contract with Epletveit, breaks sod, prepares the land for crop and places other valuable improvements thereon.

As an affirmative defense the defendant Solberg pleaded estoppel alleging that plaintiffs knew that defendant was expending labor and money in plowing and cultivating the described lands without registering any objection or asserting "any right or claim to the said lands, until after all the plowing was completed." Under the facts and circumstances of this case a court of equity will not declare Flesch's claimed right to possession under his concealed written lease to be prior to Solberg's actual and continued possession under the contract of sale given him by Epletveit the owner of the legal title. In other words a court of equity will not aid plaintiffs in acquiring for their own profit and use the benefits of Solberg's work, labor and improvements supplied by him without notice or knowledge of Flesch's claimed right to possession of the property and in complete ignorance of the private deal made by and between the plaintiffs in an attempt to tie up the surface rights to the land for a long term of years. Equity aids the vigilant and not those who slumber on their rights. A court of equity seeks to do justice and not injustice.

The maxim of equity declaring that he who seeks equity must do equity presupposes that equitable claims, as

distinguished from legal rights, have arisen out of the subject matter of the litigation in favor of each of the parties. 19 Am. Jur. title "Equity," sec. 465, p. 321. Equity will not permit a mere form to conceal the real position and substantial rights of parties. "Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the real relations of the parties. It will never suffer mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction." 2 Pomeroy's Equity Jur., 5th Ed., sec. 378, p. 41.

The judgment and decree of the lower court is reversed. The cause is remanded with direction to enter a decree for the defendant Martin S. Solberg adjudging that at the time of the commencement of this action and at all times since said defendant was and is entitled to the immediate possession and that he was and is in the actual possession of all the lands described in plaintiffs' complaint; that defendant's rights to such possession was and is prior to that of plaintiffs; that all adverse claims of the plaintiff William Flesch and all persons claiming or to claim said lands or any part thereof through or under said plaintiff are decreed to be invalid and groundless as against the defendant Martin S. Solberg and that said defendant's rights under his said contract of sale and purchase are quieted against all claims, demands and pretensions of the plaintiff William Flesch and that he is estopped and enjoined from setting up any claim to said land adverse to the claim of the defendant or from interfering with the possession of the defendant; that plaintiffs have and take nothing herein and that defendant have and recover his costs. It is so ordered.

Mr. Chief Justice Lindquist and Associate Justices Morris and Angstman, concur.

Mr. Justice Cheadle (dissenting).

I recognize the futility of dissenting opinions, and hesitate to uselessly encumber the already over-stuffed reports. Nonetheless, I must refuse to surrender my convictions, or to sub-

scribe, as a measure of expediency, to a judgment with which I thoroughly disagree and which I believe ill-considered.

I agree, of course, with the abstract principles expounded in the opinion, but must insist their inapplicability to the facts. The findings of the trial court (historically and popularly supposed to be the trier of facts and weigher of evidence in such cases) are amply supported by the conflicting evidence. Such evidence, I feel, has been supplanted by the author of the prevailing opinion by speculative assumptions not supported by the record.

I shall not review the pleadings or evidence, except to point out that the contract relied upon by the defendant consists of a unilateral, so-called "Receipt For Payment on Land," in the following language:

"I, the undersigned, Gunder Epletveit, do hereby acknowledge receipt of the sum of one dollar ($1.00) paid to me by Martin S. Solberg, it being understood and agreed that I will sell to him the following described land in Toole County, Montana, at and for the sum of three hundred twenty dollars ($320.00) when the title to said land has been quieted thru court proceedings, or otherwise, reserving thereout and therefrom unto myself all of the oil, gas and other minerals in and under said land. The balance of $319.00 to be paid to me immediately upon my executing and delivering to said Martin S. Solberg a deed to said land.

"The land above referred to is described as the south half of the northwest quarter of Section 3 in Township 33 North, Range 2 West, M. P. M.

"Dated at Shelby, Montana, this 18th day of September, 1943.

"(Signed)    Gunder Epletveit."

The testimony shows some preliminary negotiations between Epletveit and Solberg, the agreement being reduced to writing in the instrument quoted. Obviously this instrument does not expressly confer a present right of possession in Solberg. And even though the preliminary verbal discussions between these

parties be considered a part of the contract, it is still impossible to find an implied provision for such possession. In the absence of such expressed or implied provision, the trial court correctly held that the defendant was not entitled to present possession. Havens v. Alameda County, 30 Cal. App. 206, 157 Pac. 821; Jones Cyc. of Real Property, Perm. Ed., Vol. 1, p. 612; Tiffany Real Property, 3rd Ed., Vol. 1, sec. 307; First Nat. Bank of Galata v. Montana Emporium Co., 59 Mont. 584, 197 Pac. 994; Cartin v. Hammond, 10 Mont. 1, 24 Pac. 627; Barrell v. Britton, 244 Mass. 273, 138 N. E. 579, 28 A. L. R. 1065, and annotation; Burnett v. Caldwell, 9 Wall, 290, 19 L. Ed. 712.

The majority, with respect to the right to possession, cite Kern v. Robertson, 92 Mont. 283, 12 Pac. (2d) 565, 567. The citation is not complete, however, for this significant language is omitted: ''The maxim underlying the doctrine of equitable conversion rests on a duty to do something, and until the option is exercised there is no duty and it cannot be known whether there ever will be a duty. Hence, conversion should not be presumed as of a date earlier than the date when the duty becomes certain, as that would be unreasonable and the same in effect as if the duty existed from the outset.'' Here, of course, Epletveit's obligation depended upon the occurrence of an uncertain event at some indefinite time in the future or never. It must be pointed out that time was not made an essential part of the contract, if it may be termed such, no reference is made to possession by Solberg, no provision as to improvements or to payment of taxes by him. Under defendant's contention he would apparently be entitled to the profit from the use of the land indefinitely, without sharing the same with the landowner, or even paying the taxes.

The function of this court is to interpret contracts, not to make them, a principle which has been adhered to since the court's inception.

I think the majority have overlooked the important question presented, that is, whether Flesch or whether Solberg is

entitled to possession. It seems clear to me that the record sustains the trial court's finding that the former's leasing agreement is valid and in force and effect, and superior to any rights of the latter. What rights Solberg may have by virtue of the instrument under which he claims, aside from that in issue, this court is not called upon to determine. But any such rights as he may have as against the landowner, under the circumstances, should not be permitted to deprive Flesch of the benefits of his agreement, correctly defined by the trial court.

Rehearing denied June 24, 1946.