NO.  95-517

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

EAGLE WATCH INVESTMENTS, INC.,

     Plaintiff, Respondent, and Cross-Appellant,

  v.

ALEX E. SMITH and TRUDY L. SMITH,
husband and wife,

     Defendants and Appellants.

FILED

AUG 19 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Fourteenth Judicial District,
                In and for the County of Golden Valley,
                The Honorable Roy C. Rodeghiero, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

       Michael J. Ridgeway, Hubble & Ridgeway,
       Stanford, Montana

     For Respondent:

       Geoffrey R. Keller, Matovich, Addy & Keller,
       Billings, Montana

Submitted on Briefs:  July 18, 1996

Decided:  August 19, 1996

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

On August 21, 1991, Eagle Watch Investments, Inc., filed a complaint in the District Court for the Fourteenth Judicial District in Golden Valley County in which it alleged that Alex and Trudy Smith had breached their lease agreement with Eagle Watch, and in which it sought damages for that breach. Following a nonjury trial, the District Court concluded that the Smiths owed Eagle Watch $509.56 per year for a three-year period of the lease and $20,000 per year during the time of their holdover tenancy. The Smiths appealed the District Court's decision and Eagle Watch cross-appealed. We affirm in part and reverse in part the judgment of the District Court.

We address three issues on appeal:

1.    Did the District Court err when it concluded that the Smiths owed Eagle Watch lease payments of $509.56 per year for the period of the parties' lease from 1987-1989?

2.    Did the District Court err when it concluded that the Smiths were holdover tenants for the period of time from 1990-1996?

3.    Did the District Court err when it concluded that the Smiths, as holdover tenants, owed Eagle Watch lease payments of $20,000 per year from 1990-1996?

FACTUAL BACKGROUND

Eagle Watch Investments, Inc., owns a tract of land in Golden Valley County which consists of approximately 1569 acres of farmland and 231 acres of grassland. On September 30, 1984, Eagle Watch and Alex and Trudy Smith executed a farm lease agreement

2

pertaining to that land. The lease agreement required annual cash payments of $20,000 per year ($12.75 per acre) beginning October 1, 1985, for a term of three years and provided for an optional two-year extension of the agreement and an option to purchase the land. The Smiths made the annual payments pursuant to the lease agreement for the first two years.

In the spring of 1986, Eagle Watch and the Smiths agreed to enroll the property into the Conservation Reserve Program (CRP). In July and December 1986, the Commodity Credit Corporation (CCC) accepted approximately 1502 acres of the parties' leased land into the program. Pursuant to the specific CRP contracts, the CCC agreed to pay the parties $49,975.49 per year. The Smiths received sixty-one percent ($30,485.05) and Eagle Watch received thirty-nine percent ($19,490.44) of the payment. In return, the parties agreed to give up any summer fallow that they had on the property, cultivate and spray as necessary, seed the property to a grass or grass and legume stand, control noxious weeds and insects, and establish and maintain a forage stand for ten years. The parties agreed that the Smiths would be responsible for all costs of seeding and grass establishment.

In November 1986, after the parties had entered into the CRP contracts but before the CCC had made its first payment, Eagle Watch informed the Smiths that it expected them to continue to pay the $20,000 annual lease payment in addition to the $19,490 which Eagle Watch was entitled to receive from the CRP contracts. Eagle Watch also informed the Smiths that it intended to terminate the

3

lease agreement no later than 1989 and remove the Smiths from the land and the CRP contracts at that time. In response to Eagle Watch's demands, the Smiths attempted to formally modify the lease agreement with two addenda agreements. The first addendum sought to extend the lease term from three years with a two-year extension to the ten-year term of the CRP contracts. The second addendum would have modified the agreement to substitute Eagle Watch's share of the CRP payments for the Smiths' annual $20,000 lease payment obligation. Eagle Watch did not sign either agreement.

In April 1987, the Smiths seeded the property in accordance with the CRP contract specifications. The Smiths' total seeding costs were $78,488.65, for which they were reimbursed by the Agricultural Stabilization and Conservation Service (ASCS) in the amount of $33,997.00. The ASCS certified the grass stands in September 1990.

In July 1987, the Smiths exercised the two-year lease option and extended the lease through September 30, 1989. At that time, the Smiths believed that their annual lease payment would be covered by the CCC's $19,491 annual payment to Eagle Watch. Therefore, the Smiths did not tender their annual $20,000 lease payment to Eagle Watch on October 1, 1987. On December 18, 1987, Eagle Watch sent the Smiths a notice of default for nonpayment. On January 11, 1988, the Smiths tendered a check in the amount of $509.56 to Eagle Watch with the notation "Balance of 1987 lease payment." The Smiths contended that the $20,000 payment required

4

by the lease agreement was satisfied by combining their $509.56 check and Eagle Watch's $19,490.44 CRP payment.

The Smiths sent checks in the amounts of $509.56 to Eagle Watch on October 20, 1988; on October 3, 1989; on October 12, 1990; on September 25, 1991; and on October 1, 1992. The Smiths contended that each check represented the balance due for their lease payment after Eagle Watch was paid its share of CRP proceeds. Eagle Watch refused all such payments.

Eagle Watch first attempted to resolve the dispute with the Smiths through the ASCS but was advised that ASCS would not assume jurisdiction of this dispute. Therefore, on August 21, 1991, Eagle Watch filed a complaint in the Fourteenth Judicial District Court to recover payments from the Smiths pursuant to the written agreement. Eagle Watch contended that the Smiths owed it $20,000 annually for the three years of the parties' **lease** and $20,000 annually for the years the Smiths remained on the land as holdover tenants. The Smiths contended, however, that the CRP contracts modified the lease agreement and that they owed Eagle Watch only $509.56 annually for the ten-year period of the CRP contracts.

Following a nonjury trial, the District Court decided that the CRP agreement did not extinguish or modify the parties' **lease** agreement. The District Court concluded that the parties had an equitable agreement for the years 1987-1989 pursuant to which the Smiths seeded the land to grass, made lease payments of $509.56 per year, and collected approximately $30,000 per year from the CRP. The court further concluded that during this three-year lease

5

period, Eagle Watch received its $20,000 per year lease payment from a combination of its share of the annual CRP payment and the Smiths' annual payment of $509.56. Finally, the District Court concluded that the Smiths were holdover tenants after their lease expired and during the seven years remaining on the CRP contracts, and that the Smiths were therefore required to pay Eagle Watch $20,000 annually in addition to the CRP payments that Eagle Watch received during those years.

STANDARD OF REVIEW

On appeal, Eagle Watch maintains that the District Court's order is equitable in nature and thus requires a more deferential standard of review. In particular, Eagle Watch cites § 3-2-204(5), MCA, as the applicable standard of review. That section provides:

> In equity cases and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence presented in the record, whether the same be presented by specifications of particulars in which the evidence is alleged to be insufficient or not, and determine the same, as well as questions of law, unless for good cause a new trial or the taking of further evidence in the court below be ordered. Nothing herein shall be construed to abridge in any manner the powers of the supreme court in other cases.

This Court interpreted the standard of review for equity cases in *Meridian Minerals Co. v. Nicor Minerals,* Inc. (1987), 228 Mont. 274, 282-83, 742 P.2d 456, 461:

> [S]ection 3-2-204(5), MCA . . . does not entitle [the appellant] to a *de novo* review of the evidence. This Court's function in reviewing findings of fact in a civil action tried by a district court without a jury is not to substitute its judgment in place of the trier of facts but rather it is confined to determining whether the findings of fact are clearly erroneous. Rule 52(a),

6

M.R.Civ.P. Although conflicts may exist in the evidence presented, it is the duty and function of the trial judge to resolve such conflicts. His findings will not be disturbed on appeal where they are based on substantial though conflicting evidence.

Further, there is a presumption when this Court reviews the evidence, that the trial court's judgment is correct, and that any conflicting evidence must be resolved in favor of the ruling.

. . .

Not only must conflicting evidence be resolved in favor of the District Court's ruling, but [the appellant] must shoulder the burden of proving that the evidence preponderates against the finding.

(Citations omitted.)

It is well established, however, that a district court may only accept jurisdiction in equity when no statutory or legal remedy is available. *Jeffries Coal Co. v. Industrial Accident Board* (*1952*), *126* Mont. 411, 413, 252 P.2d 1046, 1047 (citing *Epletveit v. Solberg (1946)*, 119 Mont. 45, 169 P.2d 722; *Meyer v. Lemley* (1929), *86* Mont. 83, 282 P. *268; Philbrick v. American Bank & Trust Co.* (1920), 58 Mont. 376, 193 P. 59). In this case, Montana's landlord-tenant and contract provisions provide a positive statutory remedy; therefore, the District Court could not invoke equitable jurisdiction and was required to proceed pursuant to those statutes. *See Peitzman v. Seidman* (Pa. Super. Ct. 1981), 427 A.2d 196, 198 (holding that where an adequate remedy was provided by Pennsylvania's Landlord and Tenant Act, jurisdiction of a court of equity could not be invoked). This Court cannot, therefore, look upon the District Court's order as an equitable

7

ruling and cannot invoke the more deferential standard of review set forth in *Meridian Minerals.*

Instead, our review of the district court's order is two-fold. First, we review the district court's findings of fact to determine whether they are clearly erroneous. *Daines v. Knight* (1995), 269 Mont. *320, 324, 888* P.2d 904, 906. Second, we review the district court's conclusions of law to determine whether the court's interpretation *of* the law is correct. *Carbon County v. Union Reserve Coal co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

ISSUE 1

Did the District Court err when it concluded that the Smiths owed Eagle Watch lease payments of $509.56 per year for the period of the parties' lease from 1987-1989?

Eagle Watch and the Smiths executed their written lease agreement in 1984. The parties entered into the CRP contracts in July and December 1986. Although the original lease agreement was not formally modified at that time, both parties testified at the District Court hearing that they intended the $20,000 lease payment to be satisfied by a combination of the $19,491 annual CRP payment and the Smith's annual payment of $509. In fact, Alex Smith testified that he and Peter Bouma, the president of Eagle Watch, had specifically bid the land into the CRP program at $32.70 per acre and had specifically decided on the 61/39 split because thirty-nine percent of $32.70 per acre (Eagle Watch's share) equals *$12.75* per acre, which is the exact figure that the Smiths were

paying to Eagle Watch under their pre-CRP lease agreement. Because some of the farmland did not qualify for the CRP program, however, the CRP payment was $509 short of the total annual lease payment.

At the same hearing, Peter Bouma agreed that he intended "at least for the first three years for the $20,000.00 CRP payment to be [his] payment for the lease of that land." Bouma testified that he informed the Smiths that the CRP payment would not cover their annual $20,000 lease payment only after the Smiths indicated that they believed the lease to be extended for the ten-year period of the CRP contracts. His initial intent, however, was that the lease payment would be satisfied by a combination of the CRP payment and a $509 payment from the Smiths.

On the basis of both parties' testimony at the hearing, the District Court concluded that "[t]he parties agreed to a reasonable financial arrangement during the last years of the lease" and that therefore "[Eagle Watch] is entitled to payments of $509.56 annually from [the Smiths] commencing October 1, 1987, and terminating October 1, 1989 (3 years)."

On appeal, neither party disputes the District Court's conclusion that Eagle Watch received its $20,000 annual lease payment from a combination of its CRP payment and the Smith's annual payment of $509 during the first three years of the CRP contracts (1987-1989) when the parties' lease was still in effect. In fact, Eagle Watch concedes that "it was [Eagle Watch's] belief and understanding that during those next three years, Smiths would receive approximately $30,500.00 annually from CRP and Eagle Watch

9

would receive approximately $19,500 from CRP and approximately $500 from Smiths." Eagle Watch's "belief and understanding" is further evidenced by a letter that Bouma sent to the Smiths in April 1987, prior to the commencement of the CRP term. In that letter, Bouma did not indicate that he believed that the Smiths would owe Eagle Watch $20,000 per year in addition to Eagle Watch's $19,491 payment after the start of the CRP term. Instead, Bouma stated that he should receive "some payment" from the Smiths in addition to Eagle Watch's $19,500 CRP payment. (Emphasis added.) According to Bouma, this additional payment would take into consideration that the entire property leased by the Smiths had not been enrolled in the CRP. After the Smith's received this letter, they tendered a check to Eagle Watch in the amount of $509, which compensated Eagle Watch for the difference between the acreage that the Smiths had originally leased and the acreage that the ASCS had accepted into the CRP.

Any modification of the parties' original written lease agreement is governed by § 28-2-1602, MCA, which provides: "A contract in writing may be altered by a contract in writing or by an executed oral agreement, and not otherwise." Section 28-2-1602, MCA, extends to executed oral modifications of rental payment agreements. *See Lemley v. Allen* (1983), 203 Mont. 37, 41, 659 P.2d 262, 265; *Kosena v. Eck* (1981), 195 Mont. 12, 19, 635 P.2d 1287, 1291. "An oral agreement modifying a written agreement is executed when its terms have been fully performed." *Lemley,* 203 Mont. at 41, 659 P.2d

10

at 265. This Court has held that an oral agreement that modifies the payment terms of a written lease agreement is fully executed when both parties comply with the new terms and when one party pays, and the other accepts, a different payment than that provided for in the written lease agreement. *Lemley*, 203 Mont. at 41, 659 P.2d at 265; *Kosena*, 195 Mont. at 19, 635 P.2d at 1291.

In this case, both parties complied with the requirements of the CRP contracts, which converted the property from farmland to grassland. In addition, Eagle Watch accepted the yearly CRP payments which Peter Bouma testified that he had intended to accept in lieu of the Smith's lease payments. We therefore hold that the original 1984 written lease agreement was modified by the parties' oral agreement that the original lease payment would be satisfied by the annual CRP payment and the Smiths' annual payment of $509.56 and by Peter Bouma's acceptance of the annual CRP lease payment. We affirm that part of the District Court's order which required the Smiths to pay Eagle Watch lease payments of $509.56 per year for the three remaining years of the parties' lease.

## ISSUE 2

Did the District Court err when it concluded that the Smiths were holdover tenants for the period of time from 1990-1996?

In this case, the District Court concluded that the CRP contracts did not modify the parties' lease agreement by extending the **term** of the lease to ten years. The court therefore concluded that after the parties' lease ended in 1990, the Smiths' only **claim**

11

to the land for the remaining years of the CRP contracts was as holdover tenants. The Smiths maintain, however, that they did not remain on the land as holdover tenants. Instead, the Smiths assert that the CRP contracts and the applicable federal regulations modified the underlying lease to the extent that they were inconsistent. The Smiths therefore maintain that the CRP contracts modified the term of their lease by extending it for the ten-year period of the CRP contracts.

The District Court based its conclusion that the CRP contracts did not modify the Smith's lease, in part, on *Schiewe v. Farwell* (Idaho 1993), *867* P.2d 920. In *Schiewe*, the plaintiff leased agricultural land from the defendants for five years pursuant to a written contract. After the term of the lease expired, the plaintiff maintained possession of the land on a year-to-year basis as a holdover tenant under the same terms as provided in the original agreement. After the parties entered the land into the CRP, the defendants requested that the plaintiff sign a five-year lease. The plaintiff refused, maintaining that the CRP contract provided her with a ten-year right of possession. When the defendants threatened to evict her, the plaintiff brought an action to determine whether the CRP created a right to remain on the land. The plaintiff contended that the language of the CRP contract, which is identical to the CRP contract language that the Smiths cite in this case, vested her with the right to operate the cropland during the ten-year term of the CRP contract. That

language provides that in order to be eligible for the CRP, an operator must, *inter alia*, "provide satisfactory evidence that such person will operate such cropland for the contract period." *Schiewe*, 867 P.2d at 923 (citing Section 2A(1) of the CRP contract appendix).

The Idaho Supreme Court concluded that although a lease or some proof of a continuing right to operate the land is necessary to comply with the terms of the CRP, the CRP contract does not itself create such a lease. *Schiewe*, 867 P.2d at 924. The Court reasoned that the CRP contract does not provide any terms normally associated with a lease, such as terms governing payment of property taxes, liability insurance, and maintenance of the property. *Schiewe*, 867 P.2d at 924. In addition, the Court noted that the CRP contemplates that owners and operators may change during the ten-year term of the CRP.[1] *Schiewe*, 867 P.2d at 924. The Court therefore held that "although [the plaintiff] may be a party to the [CRP contract], <u>this contract does not create a right to remain on the cropland for the contract period where no independent right exists</u>." *Schiewe*, 867 P.2d at 924 (emphasis added).

---

[1]    For example, Section 26 of the appendix to the CRP contracts provides that a new owner or operator may become a participant in the CRP contract if the person assumes the obligations of the previous participants in the program. In addition, Section 28 of the appendix to the CRP contracts states that the CRP contract may be revised or revoked "by mutual agreement between the parties."

We find the language and reasoning of *Schiewe* to be persuasive. In this case, the Smiths potentially had three years remaining on their agricultural lease with Eagle Watch when the parties entered into the CRP contracts. The Smiths' certification in the CRP contracts that they were "operators" with "general control of the farming operations on the farm" resulted solely from their right of possession and control of the land pursuant to that underlying agricultural lease. See Sections 1R and 2A(1) of the appendix to the CRP contracts. The relationship between Eagle Watch and the Smiths was as landlord and tenant, and the Smiths right to possession and control of the land pursuant to that relationship was not changed or affected by the CRP contracts.

The landlord/tenant lease relationship is independent of the CRP contract and is a matter of state law. *See, e.g., Dickson v. Edwards* (5th Cir. 1961), 293 F.2d 211, 215; *Thomas v. Dudrey* (Kansas 1972), 494 P.2d 1039, 1056 (Fatzer, C.J., dissenting). The CRP contracts and federal regulations therefore have no bearing on the right of a landlord to remove a tenant under state law. In fact, the CRP contracts clearly contemplate that a tenant's interest in the land may be reduced or entirely eliminated. Because a tenant's right of possession is only by virtue of the landlord/tenant relationship, that right may be terminated at any time in accordance with state law.

In this case, the parties' written lease agreement at the time they became parties to the CRP contracts was for a term of one year

*14*

with an option for a two-year extension. Because the Smiths timely exercised their option to remain on the land for the additional two-year period, the written lease agreement expired in 1989. The Smiths, however, remained on the land after the expiration of their lease term and continued to receive their sixty-one percent share of the annual CRP payments. Although the Smiths' right to possession of the land did not arise by virtue of the CRP contracts, the District Court concluded that the Smiths continued their possession and control of the land based on a "holdover" agricultural farm lease.

Holdover tenancies are governed by statute in Montana. For the holdover of a commercial lease, § 70-26-204, MCA, provides:

> If a lessee of real property . . . remains in possession thereof after the expiration of the hiring [of real property] and the lessor accepts a rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding 1 month when the rent is payable monthly, or in any case 1 year.

(Emphasis added.) In this case, Eagle Watch did not accept any of the Smith's $509 supplemental rent payments, but did accept annual CRP payments which the parties had intended would be applied toward the lease payment. As we held above, Eagle Watch's acceptance of those payments, combined with the parties' intent that those payments would constitute the majority of the lease payment, acted to modify the terms of the written lease agreement.

Therefore, although the CRP contracts did not create a right of possession for the ten-year term of the CRP contracts, we hold that the Smiths did lawfully remain on the land after the

15

expiration of their written lease term as "holdover" agricultural tenants. That tenancy was created when the Smiths remained on the land and continued their duties pursuant to the CRP contracts and when Eagle Watch accepted the annual CRP payments and failed to take action to remove the Smiths from the land. We therefore affirm that portion of the District Court's opinion and order which concluded that (1) the CRP contracts did not modify the underlying lease so as to provide the Smiths with a right of possession for the ten-year period of the CRP contracts, and (2) the Smiths remained on the land as holdover tenants for the remaining years of the CRP contracts, from 1990-1996.

ISSUE 3

Did the District Court err when it concluded that the Smiths, as holdover tenants, owed Eagle Watch lease payments of $20,000 per year from 1990-1996?

Section 70-26-204, MCA, provides that if the lessee of real property, including commercial and agricultural property, remains in possession of the property after the expiration of a lease and the lessor continues to accept rent on that property, "the parties are presumed to have renewed the [lease] on the same terms and for the same time, not exceeding 1 month when the rent is payable monthly, or in any case 1 year." (Emphasis added.) The presumption that the lease will continue "on the same terms and for the same time" is a disputable presumption. Section 26-1-602, MCA, (stating that all presumptions not listed as conclusive in § 26-1-601, MCA, are disputable and may be controverted by other evidence). "If the

16

presumption is not controverted, the facts must be found according to the presumption, or, if it is controverted, the presumption must be given weight as evidence." *Roseneau Foods, Inc. v. Coleman* (1962), 140 Mont. 573, 577, 374 P.2d 87, 90.

In this case, although Eagle Watch does not challenge the District Court's conclusion that the Smiths only owed Eagle Watch $509 per year for the first three years of the CRP contracts, Eagle Watch does dispute that the Smiths' holdover tenancy continued under those terms. Eagle Watch asserts that "[t]he District Court correctly held . . that Smiths owed Eagle Watch lease payments of $509.56 per year for . . . the 3-year period 1987-1989"; however, Eagle Watch maintains that "as holdover tenants the District Court properly determined that [the Smiths] owe the $20,000.00 annual lease payments to Eagle Watch, the parties never having executed a written or oral lease modification." As we determined in the first part of our opinion, there was in fact a valid executed oral modification of the terms of the parties' lease agreement for the final three years of that lease, from 1987-1989. Therefore, since the terms of the lease, at the time of its expiration, provided for yearly CRP payments to Eagle Watch plus yearly payments of $509 from the Smiths, there is a presumption that those payment terms continued to apply during the pendency of the holdover tenancy.

In this case, there is no evidence to rebut that presumption. Eagle Watch did not take steps to remove the Smiths from their holdover tenancy, pursuant to §§ 70-27-104 and -105, MCA. Furthermore, Eagle Watch did not, either prior to or during the

17

Smith's holdover tenancy, provide the Smiths with notice of an increase in rent during the pendency of that holdover tenancy. Therefore, the parties were "presumed to have renewed the [lease] on the same terms and for the same time." Section 70-26-204, MCA. Since Eagle Watch failed to adequately rebut that presumption, we hold that the Smiths were liable to Eagle Watch for annual lease payments of $509.56, pursuant to the terms of the original modified lease agreement for the remainder of their holdover tenancy. We therefore reverse that portion of the District Court's order that held that the Smiths owe Eagle Watch $20,000 per year for each year of the holdover tenancy, from 1990-1996.

On the basis of our conclusion that the parties had modified the terms of their written lease agreement to provide that CRP payments to Eagle Watch were in lieu of the full lease payment by the Smiths during the pendency of their lease, and on the basis of our conclusion that the Smiths operated under "the same terms" during the pendency of their holdover tenancy, we affirm that part of the District Court's order which concluded that the Smiths owed Eagle Watch $509 for the years 1987-1989 and reverse that part of the District Court's order that concluded that the Smiths owed Eagle Watch $20,000 for the years 1990-1996. We remand this case to the District Court for entry of a judgment consistent with this opinion.

_____
Justice

18

We concur:

_____
Chief Justice

_____

_____
Justices

August 19, 1996

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Michael J. Ridgeway
Hubble & Ridgeway
P.O. Box 556
Stanford, MT  59479

Geoffrey R. Keller
Matovich, Addy & Keller
225 Petroleum Bldg.
2812 First Ave. No.
Billings, MT  59101

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy