867 P.2d 920

**Violet SCHIEWE, a Personal Representative for the Estate of H. Arthur Schiewe, and Violet Schiewe, an individual acting in her own personal capacity, Plaintiff–Appellant,**

v.

**William A. FARWELL and Irene Farwell, husband and wife, and Mary Curl and Marian Basterrechea, Defendants–Respondent.**

**No. 20216.**

Supreme Court of Idaho,
Boise March 1993 Term.

Oct. 26, 1993.

Rehearing Denied Dec. 28, 1993.

Dissenting Opinion of
Justice Bistline Dec. 28, 1993.

Emil F. Pike, Jr., Twin Falls, for plaintiff-appellant.

Parsons, Smith, Stone & Fletcher, Burley, for defendants-respondent. William Parsons argued.

TROUT, Justice.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

This is a landlord/tenant case involving an oral lease of land and a contract under the federal Conservation Reserve Program (CRP). The plaintiff, Violet Schiewe (Schiewe), originally brought this suit as a declaratory judgment action in district court to determine her rights as a tenant on land owned by respondents, Irene and William Farwell (Farwells), Mary Curl (Curl) and Marian Basterrechea (Basterrechea). Farwells leased the land from the other respondents and administered it, together with their own, as one parcel of approximately 2,800 acres. Schiewe and her husband leased the land for farming through Farwells under a written contract for the years 1970 through 1974. Thereafter from 1975 through 1987, Schiewe and her husband maintained possession as holdover tenants on a year-to-year basis under the same terms as their previous written lease.

In 1987, Farwells decided to enter 2,214 acres of the land into a CRP contract with the federal government. This program provides reimbursement to farm owners and operators who desire to take certain ground out of production.[1] The Schiewes were included in the contract as operators of the ground in question who desired to participate in the program. The contract required that the participants place the land into the CRP program for a period of ten years.

After Mr. Schiewe died in July of 1987, his widow prepared the land by spraying for noxious weeds and planting grass seed pursuant to the requirements of the contract. Farwells and Schiewe split the cost of the seed and the herbicide and received partial reimbursement from the federal government. Schiewe paid for spraying of the land, repaired equipment and provided labor, for which she was not reimbursed. Schiewe and Farwells divided the profits under the CRP contract according to the same terms as their previous sharecropping agreement. Farwells and Schiewe were each to receive about $50,000 per year after Curl and Basterrechea had been paid.

In 1988, Farwells requested that Schiewe sign a five-year lease. Schiewe refused to sign the lease because she believed she had a right to remain on the land for ten years under the terms of the CRP contract. As a result, Farwells threatened to evict Schiewe as a holdover tenant and Schiewe brought an action in district court to determine if she had a right to remain on the land.

The district court held that Schiewe was operating under an oral year-to-year lease and did not have any extended rights to lease the land under the CRP contract. The court also found that the doctrine of equitable estoppel did not apply because Farwells did not misrepresent or conceal material facts in negotiations with Schiewe.

Schiewe appealed and the case was assigned to the Court of Appeals. In her brief on appeal, Schiewe argued that: (1) the CRP contract qualifies as a lease under the circumstances of this case; (2) the doctrines of equitable estoppel and part performance should apply; (3) she had a right to remain on the land as an "operator" under the CRP contract; and (4) Farwells should not have been awarded costs.

The Court of Appeals held that Schiewe had a right to stay on the land because the CRP contract created legal obligations which were independent of any obligations created by the prior lease. The Court also concluded that Schiewe did not intend to limit her argument to the theory of equitable estoppel and found that the trial court erred in not applying quasi-estoppel to this case. Far-

---

1. "Operator" is defined in the CRP contract as "a person who is in general control of the farming operations of the farm."

"Owner" is defined as "a person who has legal ownership of farmland including a person who is buying farmland under a purchase agreement."

wells petitioned the Supreme Court to review the decision of the Court of Appeals reversing the trial court and this Court granted review.

## II.

### THIS COURT WILL NOT ADDRESS THE ISSUE OF QUASI–ESTOPPEL AS THAT ISSUE WAS NOT RAISED BEFORE THE TRIAL COURT

 In cases which come before the Supreme Court on a petition for review of a Court of Appeals decision, this Court gives serious consideration to the views of the Court of Appeals; however, this Court reviews the opinion of the trial court directly. *Matter of Hanson,* 121 Idaho 507, 509, 826 P.2d 468, 470 (1992). On appeal, neither this Court, nor the Court of Appeals, can consider issues which were not raised before the trial court. *See Old Nat'l Bank of Washington v. Tate,* 122 Idaho 401, 402, 834 P.2d 1317, 1318 (1992); *Sun Valley Shopping Center, Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). In her response to Farwells' petition for review, Schiewe asserts that she raised the issue of quasi-estoppel at trial. We disagree.

 Quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by [them]. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which [they] acquiesced, or of which [they] accepted a benefit." *KTVB, Inc. v. Boise City,* 94 Idaho 279, 281, 486 P.2d 992, 994 (1971). The doctrine of quasi-estoppel is distinguishable from equitable estoppel in that "no concealment or misrepresentation of existing facts on the one side, nor ignorance or reliance on the other, is a necessary ingredient." *Obray v. Mitchell,* 98 Idaho 533, 538, 567 P.2d 1284, 1289 (1977); *see also Hecla Mining Co. v. Star–Morning Mining Co.,* 122 Idaho 778, 784, 839 P.2d 1192, 1197 (1992).

At trial, Schiewe did not specifically plead quasi-estoppel, nor did she argue case law involving quasi-estoppel. In her reply to Farwells' counterclaim, Schiewe alleged as an affirmative defense that she materially changed her position in reliance on oral representations made by Farwells and, accordingly, Farwells should be estopped from denying the validity of the ten year contract. In briefs to the trial court, Schiewe alleged that Farwells made a false representation by entering into the ten-year contract without the intent to include Schiewe in the full ten years of the contract. The elements of false representation and reliance indicate that Schiewe raised and argued the theory of equitable estoppel, not quasi-estoppel. The trial court, after considering the pleadings, arguments and evidence presented by the parties, ruled on the issue of equitable estoppel which was presented to it and did not address the issue of quasi-estoppel. We conclude that the issue of quasi-estoppel was not raised at trial; accordingly, we will not now address the issue on appeal. *See Old Nat'l Bank of Washington,* 122 Idaho at 401, 834 P.2d at 1318.

## III.

### THE CRP CONTRACT DID NOT CREATE A RIGHT TO REMAIN ON THE LAND FOR TEN YEARS

 The district court found that Schiewe was operating solely under a year-to-year tenancy and no additional rights to remain on the property were created by the CRP contract. We agree.

The CRP contract requires an operator to produce some proof of a right to operate the farm land for the term of the contract. In order to be eligible for the program under Section 2A(1) of the contract, an operator

> must have operated [the] cropland for the period beginning not less than 3 years prior to the close of the applicable period for entering into contracts with CCC [Commodity Credit Corporation] or January 1, 1985, whichever is later, *and must provide satisfactory evidence that such person will operate such cropland for the contract period.*

(Emphasis added). This provision is in accordance with the requirements of 16 U.S.C. § 3835(a)(2)(B).

In this case, Schiewe contends she had a lease for the term of the CRP contract because she is the operator of the cropland. Although a lease or some proof of a continuing right to operate the ground is necessary to comply with the CRP contract, the contract itself does not create such a lease. By requiring "satisfactory evidence," it is clear that the contract contemplates that there must be some outside proof of the operator's right to continue to operate the land for the contract period.

Because Schiewe and Farwells were permitted to enter into the agreement we must assume that some appropriate proof was presented to the CCC prior to entering into the contract. There is nothing, however, in the record before this Court which demonstrates what, if anything, Schiewe might have provided as independent evidence that she would operate the cropland for the contract period. We are left with only the evidence that she had been farming under a year-to-year oral lease from 1974 to 1987, and no new lease was signed before or after entering the CRP contract. Furthermore, the CRP contract does not provide for any of the standard lease provisions which we would expect to find in a document governing the possession of land, such as payment of property taxes, liability insurance and maintenance of buildings on the property.

Consequently, although Schiewe may be a party to the contract, this contract does not create a right to remain on the cropland for the contract period where no independent right exists. The provisions of the CRP contract specifically contemplate that owners or operators may change during the contract term. Section 26 states that a new owner or operator may become a participant in the contract if such a person assumes the obligations of the previous participants in the contract. Section 28 of the CRP contract states that the contract "may not be revoked or revised unless upon mutual agreement between the parties." Both of these provisions clearly anticipate that changes may occur, so long as all parties to the agreement concur. We are left then with the question of what occurs if a term of the contract changes without the mutual agreement of the

participants; such as the termination of the operator's tenancy.

Under section 15 of the CRP contract, an owner of land will not be paid if the owner: (1) has not given the tenant an opportunity to participate in the program; (2) reduces the number of tenants on the farm *by forcing tenants off the land;* (3) uses the contract to deprive a tenant of a benefit; (4) increases the rent or reduces the share of proceeds a tenant was entitled to receive. This provision does not guarantee a tenant a right to remain on the land for the period of the CRP contract, it only prevents owners from benefitting by reducing the number of tenants and keeping the profits to themselves. The purpose of the CRP contract is to provide for reimbursement payments to those who are willing to participate in the program. The method of enforcing the provisions is to withhold payment, or in some instances, to force participants to pay back the government for benefits wrongfully received. There is nothing in the contract or program which creates a right to possession of the property in addition to the payments.

We note that this case is before us as a declaratory judgment action to determine whether Schiewe has a right to remain on the land. We are not determining the parties' other rights and obligations under the CRP contract. Whether the parties have fully complied with the requirements for entering and completing the CRP contract, or whether Farwells will continue to have any right to payments under the agreement, are questions not presented to this Court. Accordingly, we affirm the trial court and hold that Schiewe's right to the land is limited to the provisions of the year-to-year oral lease.

## IV.

## THE DOCTRINES OF EQUITABLE ESTOPPEL AND PART PERFORMANCE DO NOT APPLY IN THIS CASE

■■■ The trial court found that the doctrine of equitable estoppel did not apply in this case because Farwells did not misrepresent any material facts. This Court will not overturn a factual finding of a trial court unless such finding is clearly erroneous.

*Alumet v. Bear Lake Grazing Co.*, 119 Idaho 946, 949, 812 P.2d 253, 256 (1991). The Court must accept the trial court's findings of fact if they are supported by substantial, competent evidence. *Id.* We have reviewed the record at trial and find no indication that Farwells misrepresented or concealed material facts with respect to the CRP contract. Although they signed a ten year contract, both parties were aware of the provisions of the contract and of the oral lease. There is substantial, competent evidence to indicate that Farwells made no promise of a ten-year lease. Accordingly, we hold that the trial court's finding was not clearly erroneous and affirm the court's decision on the issue of equitable estoppel.

 The trial court found that the doctrine of part performance did not apply because Schiewe was operating under a year-to-year lease. We agree with the trial court. In general, part performance is an affirmative defense to an assertion that a lease is invalid under the statute of frauds. *See Fry v. Weyen,* 58 Idaho 181, 70 P.2d 359 (1937). The doctrine of part performance is not applicable to the facts of this case. Even if the CRP contract created some right to possess the real property, the doctrine does not apply to it because, as a written document, the contract complies with I.C. § 9–505 and does not implicate the statute of frauds. Similarly, part performance does not apply to the oral lease because it was only for one year and the statute of frauds is not implicated if the contract involving the lease of real property is for a term of less than one year. I.C. § 9–505(5)

## V.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN AWARDING COSTS

The trial court awarded Farwells costs at trial as the prevailing party under I.R.C.P. 54(d). After reviewing the record under the abuse of discretion test outlined in *Sun Valley Shopping Center,* 119 Idaho at 94, 803 P.2d at 1000, we find that the trial court did not abuse its discretion in awarding costs to Farwells.

## VI.

## CONCLUSION

For the above reasons we affirm the decision of the trial court. No costs or attorney fees awarded on appeal.

McDEVITT, C.J., and JOHNSON, J., concur.

McDERMOTT, J. Pro Tem., dissenting.

I respectfully depart from the authored opinion of Justice Linda Trout and would affirm the opinion of the Court of Appeals.

From 1970 to 1987, Schiewe and her husband, now deceased, farmed the property which is at the center of this litigation. Those initial years were pursuant to a five year written lease which was never renewed. Thereafter the Schiewes remained on the land as a permissive hold-over tenant on a year-to-year basis. For the better part of seventeen years the Schiewes made their livelihood from this land. Their initiative and productivity benefitted the Farwells, who were the owners of the land, and also the holders of leases obtained from Mary Curl and Marian Basterrechea. The record before this Court is void of any problems between the parties during this time that would have given the Farwells reason or cause to terminate the Schiewes' right to remain on the land.

In 1987, the Farwells, the Schiewes, and the other named participants decided to enter the property (2,414 acres) into the Conservation Reserve Program (CRP). In July of 1987 Mr. Schiewe died, and his widow, Violet Schiewe, assumed responsibility as operator of the farm. Accordingly, Mrs. Schiewe prepared the land for performance of the terms of the CRP contract which began in that year. She expended substantial time, effort and money to this end. In 1988, Farwell approached Schiewe and requested her to sign a five year lease which would nearly halve the payments owed to her under the CRP contract. Understandably, Mrs. Schiewe refused, asserting that she had rights to remain on the land for the ten year period of the CRP contract. Farwell denied

that she had that right, and this litigation ensued in the form of a declaratory action.

## 1. Estoppel

The opinion for the Court does not allow Schiewe to present her claim of quasi-estoppel, purportedly because it was not specifically pled and argued before the trial court. In proper circumstances, this Court does refuse to consider issues on appeal that were not raised before the trial court. Nevertheless, it is clear that Schiewe did plead estoppel.

The underlying policy of the Idaho Rules of Civil Procedure has always been to liberally construe pleadings to allow for fair and efficient handling of civil matters and resolve disputes on their merits, not on technicalities. The trial court, and now in turn, the majority have chosen to "split hairs" as to whether Schiewe pleaded "equitable estoppel"[2] or "quasi-estoppel."[3] The result obviously is that under equitable estoppel Schiewe is afforded no trial on the merits, and under quasi-estoppel she is.

Quasi-estoppel is a broadly remedial doctrine, often applied ad hoc to specific fact patterns. *Schiewe v. Farwell,* 125 Idaho 70, 73, 867 P.2d 944, 947 (Ct.App.1992); *Keesee v. Fetzek,* 111 Idaho 360, 362, 723 P.2d 904, 906 (Ct.App.1986). The doctrine is designed to prevent a party from reaping an unconscionable advantage, or from imposing an unconscionable disadvantage upon another, by asserting to the pleader's disadvantage a right that is inconsistent with one in which he accepted a benefit. *Tommerup v. Albertson's, Inc.,* 101 Idaho 1, 6, 607 P.2d 1055, 1060 (1980); *Schiewe,* 125 Idaho at 73, 867 P.2d at 947; *Keesee,* 111 Idaho at 362, 723 P.2d at 906. Quasi-estoppel, unlike the more

traditional form of estoppel (called estoppel in pais or equitable estoppel), does not require misrepresentation by one party or actual reliance by the other.

From the record presented it is not certain how the trial court and in turn the majority of this Court concludes that Schiewe intended to limit her case to equitable estoppel only and not to include a theory of quasi-estoppel. Black's Law Dictionary, which contains the most fundamental propositions of law, states that " 'Equitable estoppel' [is a] convertible term[ ] embracing 'quasi estoppel.' " The elements which must be proved in a claim for equitable estoppel necessarily encompass those elements necessary to prove quasi-estoppel. In other words, because Mrs. Schiewe argued that she detrimentally relied on Farwell's misrepresentations, she essentially argued that she has been disadvantaged by his actions. The advantage reaped by Farwell—$20,000 or more per year—is unarguably unconscionable.

Furthermore, the policy behind encouraging parties to appeal only those issues that were tried below is to provide fair notice to the other party. Here, Farwell clearly received notice of Mrs. Schiewe's claim of quasi-estoppel, since, as noted above, she essentially argued its exact elements. *See Frost v. Mead,* 86 Idaho 155, 166, 383 P.2d 834, 839 (1963). Moreover, at least one other court has concluded that "glaring inconsistencies" among the oral promises by a landowner to his tenant, under the auspices of a soil bank program, are enough to estop the landowner's legal defenses. *Daley v. Daley,* 150 Montana 432, 436 P.2d 88, 90 (1968).

---

**2.** The elements of equitable estoppel are: (1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) the party asserting estoppel did not know or could not discover the truth; (3) the false representation or concealment was made with the intent that it be relied upon; and (4) the person to whom the representation was made or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice. *Theriault v. A.H. Robins Co., Inc.,* 108 Idaho 303, 307, 698 P.2d 365, 369 (1985).

**3.** *Schiewe,* 125 Idaho at 73, 867 P.2d at 947; *Keesee v. Fetzek,* 111 Idaho 360, 362, 723 P.2d

904, 906 (Ct.App.1986). The doctrine of quasi-estoppel requires that "the person against whom the estoppel is sought must have gained some advantage for himself or produced some *disadvantage* to another or the person involving the estoppel must have been adduced to change his position; in addition it must be unconscionable to allow the person against whom the estoppel is sought to maintain a position which is inconsistent with the one in which he accepted the benefit." *Schiewe,* 125 Idaho at 73, 867 P.2d at 947; *Tommerup v. Albertson's, Inc.,* 101 Idaho 1, 6, 607 P.2d 1055, 1060 (1980).

The opinion of the Court of Appeals is better reasoned and more persuasive than the majority opinion, given the totality of the circumstances surrounding this particular case:

The applicability of quasi estoppel turns upon the specific facts and circumstances of the case under consideration. *William Lake Lands* [*v. LeMoyne Development*], 108 Idaho [826] at 829, 702 P.2d [864] at 867. As noted above, the facts in this case are not in dispute. After having enjoyed a long landlord-tenant relationship, Schiewe, together with Farwell, entered into a ten-year CRP Contract. By entering into the CRP Contract and by having Schiewe sign the contract as the operator of the land, Farwell led Schiewe to believe that she would have the benefit of the ten-year contract which would pay her $50,000 per year. Under the terms of the contract, Schiewe took the land out of production. Schiewe incurred considerable expense to prepare the land, seed it with grass, and spray it for noxious weeds. After Schiewe's husband died, Farwell attempted to terminate Schiewe's tenancy. Initially, Farwell presented Schiewe with a five-year lease contract which would have reduced the amount she received yearly to $30,000. Schiewe refused to sign the contract. Farwell then gave her notice of his intent to terminate her tenancy.

Farwell gained an advantage for himself by inducing Schiewe to enter the CRP Contract and perform the work necessary to take the land out of production. After he obtained this benefit, he decided to terminate her tenancy. Terminating Schiewe's tenancy midway through the contract is a position which is inconsistent with the representation Farwell initially made to Schiewe by entering into the CRP Contract. By changing his position and terminating the contract, Farwell deprives Schiewe of the benefits she expected to enjoy as a participant in the CRP program. This is an unconscionable disadvantage to Schiewe. In reaching this conclusion, we rely on our interpretation of the CRP Contract which provides significant protections to tenants and operators and which prohibits a landlord from unilateral-

ly excluding a tenant from enjoying the benefits of the CRP program.

**2. Statute of Frauds**

In Idaho some agreements must be evidenced by a writing. Idaho Code § 9–505 governs these transactions. In relevant part it provides:

**9–505. Certain agreements to be in writing.**—In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents:

1. An agreement that by its terms is not to be performed within a year from the making therefrom.

. . . .

5. An agreement for the leasing, for a longer period than one (1) year, or for the sale, of real property, or of an interest therein, and such agreement, . . .

The CRP contract satisfies those requirements and therefore suffices as a binding contract (memorandum) regarding the ten year executed written commitment of both the Farwells and the Schiewes, respectively "owners" and "operators," especially when taken together with their possession and actual farming of the property.

Although no particular form of language or instrument is necessary to constitute a note or memorandum required by the statute, the essentials of the oral agreement must be contained in the writings. The memorandum must plainly set forth the parties to the contract, the subject matter thereof, the price or consideration, a description of the property and all the essential terms and conditions of the agreement.

*Hoffman v. Sun Valley Co., Inc.*, 102 Idaho 187, 190, 628 P.2d 218, 221 (1981).

The majority opinion states that the CRP contract is insufficient because it does not mention the responsibilities of the landlord and tenant regarding taxes, maintenance and the like on the property. The record dis-

closes that *these responsibilities were well understood by the parties and had been for the prior seventeen years.* The Schiewes maintained the property, buildings and equipment, and Farwell took care of the taxes and capital expenditures for equipment and the like. It is patently obvious that the parties were well-engaged in a binding ten year arrangement by their joint venture participation in negotiating and executing the CRP contract. Although *the contract* is not a lease and facially does not purport to be a lease, it is and should be recognized as a written memorandum evidencing what initially may have been an oral arrangement or agreement of the parties for a term of ten years. *The CRP contract was signed by both of the Farwells and by both of the Schiewes.* Given the past performance of the Schiewes and Farwells over many prior years regarding the subject property, it is clear that the parties' agreement complied with Idaho Code § 9–505.

In order to enter into a CRP contract, the federal government does not require of the "owners" or of the "operators" that there be a written lease between those two parties. What the government seeks in its conservation program is obtaining a written contract with two persons, one of whom is a qualified owner of crop land and the other person is a qualified farmer. In the parlance of the farming industry in conjunction with the federal Conservation Reserve Program, an owner is an owner/landlord, and the farmer is an operator in charge of farming operations, all of which is readily understood by examining the government contract to which both the operator and the owner have as such affixed their signatures. By the documented actions of *two* of their field representatives in signing the CRP contract, the federal administrators of the CRP program demonstrated their approval of the contract and of the participants, Farwells as owner/landlords and Schiewes as operator/tenants. On the death of Mr. Schiewe, Violet Schiewe undertook the function of sole operator, to which the Farwells and the CCC quietly acceded. The majority opinion is therefore clearly wrong when it second-guesses the federal government and concludes that Mrs. Schiewe did not provide "satisfactory evidence that [the operator] will operate such cropland for the contract period." Mrs. Schiewe's testimony, excerpted in Justice Bistline's dissent, below, alone provides the "satisfactory evidence."

### 3. Schiewe's Costs

By attempting to change positions, Farwell has both received an unconscionable advantage and imposed an unconscionable disadvantage. Mrs. Schiewe expended substantial time, money and labor in preparing this property for performance of the CRP contract-endeavors for which she has only been partially reimbursed. The trial court first, and now the majority opinion, both overlook Schiewe's rights regarding reimbursement for preparing the land for performance of this CRP contract. In preparation for this contract Schiewe had to prepare the land to be seeded. Additionally, there was spraying for noxious weeds and other related preparations. The federal government, pursuant to a formula within the CRP contract, reimbursed both parties for fifty percent of their expenditures. However, this formula does not take into account the value of one's labor in implementing such a contract. Schiewe was not reimbursed for the labor expended in preparation for execution of the CRP contract, and this benefit has enured unjustly to Farwell.

For the above reasons, the decision of the Court of Appeals should be affirmed; this cause should be remanded to the trial court for further proceedings not inconsistent herewith. If Schiewe is by some means, and only artifice comes to mind, removed from the land and thus from the benefits due her under the CRP contract, she should be reimbursed one hundred percent for the costs incurred pursuant to her participation in the CRP contract, and likewise for her expenses in implementing the contract.

BISTLINE, J. concurs.

BISTLINE, Justice dissenting from the opinion authored by Justice Trout, and concurring in McDERMOTT, Justice Pro Tem.'s dissenting opinion.

As the opinion for the Court states, the Court of Appeals found in favor of Schiewe

based in part on the theory of quasi-estoppel. The majority opinion then declares that the issue of quasi-estoppel was not raised at trial and was therefore improper for the Court of Appeals to consider. For reasons explained by Justice McDermott, I am not so persuaded, and to the contrary find that the quasi-estoppel theory was raised in the district court. This dissenting opinion also calls to the reader's attention some of the facts that the opinion for the Court overlooks, apparently by oversight.

### PART I.

Violet Schiewe, surviving widow of H. Arthur Schiewe, has appealed to this Court challenging the verity of the trial court's decision. The appeal came to us from the Court of Appeals following our grant of William A. and Irene Farwells' petition for review. Also now before this Court is Mrs. Schiewe's request that we review the district court's entry of a declaratory judgment regarding the respective rights of agricultural landowners, respondents William A. and Irene Farwell, Mary Curl, and Marian Basterrechea (collectively, "Farwell" or "the Farwells"), and their operator/tenant, Violet Schiewe, in and to a Conservation Reserve Program Contract ("CRP contract") which the named parties executed with the Commodity Credit Corporation (CCC).[4]

William Farwell, a named defendant, and his wife, Irene, are the owners of some of the farmland that is subject to the CRP contract and also have acquired leases to the lands of Basterrechea and Curl, both also being owners. This action arose when Farwell sought to terminate the tenancy of Violet Schiewe, who, together with her husband (since deceased), had farmed the cropland since 1970. Schiewe contends that, notwithstanding the

absence of a written lease, the CRP contract evidences a ten year commitment to the CRP by the owners of the farmland and herself as the operator who would be in charge of ascertaining that the requirements of the CRP would be executed.

Farwell answered the complaint arguing that Schiewe's claim was barred by the statute of frauds and filed a counterclaim asking the court to declare that Schiewe had no right to occupy the land. In response to the counterclaim, Schiewe argued that Farwell was estopped from denying the ten year contract and that the oral contract *was* enforceable because Schiewe had detrimentally relied on Farwell's representations and because Schiewe had partially performed the contract. The controversy went to trial. The district court rejected Schiewe's argument and held that upon expiration of the initial written lease in 1974, Schiewe became a holdover tenant with a year-to-year oral tenancy. The district court further held that the CRP contract was not a lease and that the provisions in the CRP contract did not give Schiewe a right to possession beyond the end of 1990. Schiewe maintains that her claim is based on her independent rights under the CRP contract and not on her rights as a holdover tenant. The Court of Appeals concluded that the CRP contract created legal obligations and relationships independent of the prior lease and that the landlords breached these obligations. On that basis, the Court of Appeals reversed the judgment of the district court. The Court of Appeals is to be commended for having done so, as is readily seen.

The Court of Appeals deemed that the following underlying acts were relevant to reaching a just decision. Mary Curl and Marian Basterrechea leased their land to William and Irene Farwell.[5] The Farwells,

4. It will be helpful to the interested reader in understanding references made to government contracts and designations, to bring attention to those particular paragraphs of "Appendix to Form CRP–1, Conservation Reserve Program Contract" which are applicable herein. Those terms and definitions are attached as "Appendix A" to this dissenting opinion.

5. Placed in proper context, the fact of the matter is that Farwell obtained leases from Curl and

Basterrechea. Farwell was the actor seeking and obtaining those leases. In what has heretofore been written, by the trial court, by the Court of Appeals, and most recently in the opinion for the Court, no one has paused to take note that in seeking leases from Curl and Basterrechea, Farwell courted their approval by inserting into both of the leases that, although the lease could not be subleased without the Lessor's consent, they therein gave their consent that Farwell could sublease to the Schiewes.

in turn, subleased this land together with other land which the Farwells owned to H. Arthur and Violet Schiewe. A five year written lease agreement had been executed in March 1970 (the 1970 Lease Agreement). Under the terms of the 1970 Lease Agreement, the Schiewes were to pay, as a yearly rental fee, one-half of all crops grown or produced upon the leased farmland. The written lease expired on December 31, 1974. Under a verbal year-to-year lease with the same terms of the original written lease, the Schiewes continued to farm the land until February 1987. Seventeen years is a long span of time and during all of that time Violet Schiewe labored on the land, as much for the Farwells as for herself. The continuing verbal lease agreements between Mrs. Schiewe and Farwell were notably informal, as is evidenced below in Mrs. Schiewe's unchallenged deposition testimony regarding a five year lease she had previously mentioned:

A. The first five year lease that Art and Bill had was in 1970. And there was never mentioned any other lease all the time my husband worked for him.

Q. Mrs. Schiewe, I am handing you what the reporter has marked for identification as Exhibit 1. I will ask you if you can recognize that document.

A. This is it.

Q. And when you say 'this is it,' is this the lease that you mentioned in a prior response, when you and your attorney and I were talking, that you had?

A. (Witness indicates.)

Q. And to your knowledge, is this the only written lease that was signed by the Farwells and your husband during the time of their involvement?

A. To my knowledge, that's the only one.

MR. PARSONS: I'd like to substitute a copy of that after we get through with the deposition.

Q. After this lease expired, which is Deposition Exhibit 1, which purports on its face to end December 31st, 1974, there were no other written leases, as I understand your testimony?

A. To my knowledge, there wasn't.

Q. And you and your husband continued to run the dry farm after 1974 through his death, correct?

A. Right.

Q. And was that under an oral understanding?

The Mary Curl lease to William A. Farwell was executed on March 30, 1990, and contained provisions describing the real property involved, the fact that Farwell had been in possession of the property under a lease entered into on April 19, 1979, and which was extended in 1985 through December 31, 1989, and that the term of the current lease which was for an additional five years (January 1, 1990, through December 31, 1994). It was also acknowledged that Farwell had subleased all of the Curl property to Art Schiewe and Violet Schiewe and that Schiewes had already placed all of the farmable acres of said property in the conservation reserve program (CRP) of the Agricultural Stabilization and Conservation Service of the United States Department of Agriculture. The Curl property was placed in the CRP program in 1987 and was to remain in said program until 1997.

The lease between Mariana [Marian] Basterrechea and William A. Farwell and Irene Farwell, entered into on January 3, 1989, contained provisions describing the real property involved, and specified a term of five years to commence on January 1, 1989 (there is no mention in this lease of a previous lease between the Lessee and Lessor, but presumably there was one). Farwell was given the option of placing the real property in the "government program" or to raise crops thereon. It was also provided that, "the Lessee shall not assign, encumber, or otherwise transfer this lease, any right or interest in the lease, or any right or interest in the premises without the express written consent of the Lessor. *The Lessor consents to the subleasing to Schiewe."* Defendant's Exhibit G.

Nothing in the appeal record suggests anything other than that Farwell had in mind to enter into a ten year CRP contract and also that he wanted the Schiewes, rather than other lessees, to be in that program with him. He let that be known by the simple expediency of the language he had interposed in the Basterrechea and the Curl leases, *making it clear that he held the leases on their properties and that such leases were already assigned to the Schiewes in accordance with the practice of the last seventeen years.* The Curl and Basterrechea leases show, therefore, that Mrs. Schiewe was justified in relying on her continued right to remain. Thereafter, following the death of Mr. Schiewe, Farwell engaged himself in an endeavor to dispossess Mrs. Schiewe as the operator, which would likely enure to the benefit of the Farwells. The question now becomes: Will a court possessed of equitable powers, as is this Court, countenance his conduct?

A. It must have been, sir. There was never any disagreement on it.

Q. So to your knowledge, everything after 1974 was oral?

A. Yes.

Q. And do you know what the percent of the crops, or the cash, or what the terms of the lease was?

A. The term of the lease was one-half to the lessor, and one-half of the crop to the lessee.

Q. So it was a share crop?

A. Yes.

. . . .

Q. Were you even present during any discussions between Mr. Schiewe and the Farwells concerning leasing the farm?

A. Yes, sir; I was present at most all of them. He would come in and sit at my kitchen table. I would serve him a drink and some special treat; and we all three sat and talked things together.

Q. When you say 'he,' to whom are you referring?

A. Bill and Art and I.

Q. Bill Farwell?

A. Bill Farwell; yes, sir.

Q. Let's start in this order: In the year 1987 prior to the time Mr. Schiewe passed away, did you and—were you present at any discussions with Mr. Farwell and your husband?

A. Yes.

Q. And where was that conversation?

A. Well, several places. One was on the back porch of our farmhouse out there. And in the kitchen, out by the combines, in the machine shed; and several other places. We would just gather on the lawn and sit, many times.

Q. During these meetings, did you ever talk with Mr. Farwell about the lease?

A. It was never mentioned, sir.

Q. No lease ever mentioned?

A. To my knowledge, never.

Q. So in terms of operating the farm, you didn't discuss it? You talked about other things?

A. As far as I know, there was never any mention to my husband, either; because he and I talked things over all the time. We had a mutual agreement on things.

Q. Do you know, of your own knowledge, whether Mr. Farwell and your husband did in fact talk about a lease at a time when you were not present?

A. No, because my husband always talked to me about business and things like this. I always did the mailing and the paying of the bills when he asked me to, when Art Schiewe asked me to.

Q. So based on your previous relation with your husband, you don't think there was a conversation?

A. Not according to anything Art said or anything I heard. It was never mentioned about a lease, ever.

Q. Did you ever discuss the CRP or the government contract with Mr. Farwell?

A. Several times, yes.

Q. Okay, what was said about that?

A. They were very happy to enter into this contract.[6] And at the end of this contract, they both were laughing and happy about being able to retire. And of course, Bill was already retired.

Q. And there was nothing said about a lease during any of that?

A. Never, never, never. And I had children, I had a spray plane pilot there when they discussed this. Also, my husband discussed it with several neighbors and farmers in the community.

. . . .

Q. When was the first time you heard about a written lease with the Farwells?

A. Well, when I got that notice from you [Mr. Parsons].

**6.** The context of the deposition makes it clear that Mrs. Schiewe in using the word "they" was referring to the two men who executed the contract with the government, namely her husband, H. Arthur Schiewe, and her neighbor, William Farwell. Obviously, Mrs. Schiewe was able to answer the question because she was present. Moreover, Mr. Parsons so recognized, and made no challenge or other objection to the answer which he has solicited.

Q. And as I understand your position, Mrs. Schiewe, it's your contention that the contract with the government is the basis on which you occupy this land for ten years?

A. I realize that the contract is not a lease; but I felt, in my heart, that we would have a verbal agreement, the same as my husband and I had with William Farwell, since we were very good friends, even before he was married. We have been friends since I was 14 years old.

Record, Deposition of Violet Schiewe, 12–18.

The three landowners, together with the Schiewes, entered into a ten year CRP contract early in 1987 which placed a large portion of the land which had been subleased to the Schiewes, some 2,214 acres, into the United States Conservation Reserve Program. All parties were signatories on the contract. Pursuant to the terms of the contract, the Schiewes prepared the land, seeded it with grass, and sprayed it for noxious weeds. Under the terms of the contract, the land had to be taken out of production.

In 1987, five months after the ten year CRP contract was executed, H. Arthur Schiewe died. In the late spring of 1988, the Farwells' attorney, William Parsons, presented a five year written lease to Violet Schiewe. Schiewe was advised by her attorney that the proposed 1988 lease would reduce her yearly government payment from $50,000 to $30,000, and that such a reduction would be in conflict with the ten year CRP contract. So advised, Schiewe declined to sign the five year lease; however, she said that she would sign a lease that was consistent with the terms of the CRP contract. On Schiewe's so declining to sign the five year lease, the Farwells threatened her with eviction, thus precipitating Schiewe's filing of a declaratory relief action; therein she contended that she had a right to remain on the land for ten years under the terms of the CRP contract. In response, the Farwells answered and counterclaimed, asserting that Schiewe did not have a written lease for the land, and that a ten year oral lease is barred by the statute of frauds.

The district court ruled: (1) that Schiewe and Farwell were participants in the CRP contract and that Schiewe was an "operator" under the terms of the contract; (2) that the CRP contract did not preclude Farwell from changing tenants or terminating the landlord-tenant relationship with Schiewe; (3) that Schiewe was a holdover tenant pursuant to I.C. § 6–303(2); (4) that the CRP contract did not create a landlord-tenant relationship; (5) that Schiewe's right to remain as an operator under the CRP contract was dependent upon the existence of a landlord-tenant relationship which, in turn, depended upon the existence of either a written lease agreement or a holdover arrangement; and (6) that Schiewe's occupancy as a tenant could be terminated, after proper notice was served, at the end of 1990, the final holdover period.

Further, the district court characterized the CRP contract as a contract which gave rise to rights and obligations separate and apart from the rights and obligations of a landlord-tenant relationship and that all remedies for enforcement were within the province of the United States government. The Court of Appeals reversed the judgment of the district court under the doctrine of quasi-estoppel, holding that the Farwells could not reap an unconscionable advantage from the CRP contract by denying the existence of a lease to Schiewe as long as Schiewe remains an operator under the CRP contract.

In a brief filed November 17, 1992, captioned "Supplemental Brief of Respondents on Review from the Court of Appeals of the State of Idaho," Mr. Parsons, Farwell's attorney, asserted that: "The Court of Appeals said that Farwell gained an advantage by inducing Schiewe to enter into the CRP contract. *There is no evidence that Farwell induced Schiewe to enter into the contract* as it was done voluntarily." Supplemental Brief at 13. Unfortunately for Mr. Parsons, and his client, there *is* such evidence. The Court of Appeals saw that evidence, and this member of the Court has seen it. What is the most damning to Mr. Parsons' presentation is that the Court of Appeals opinion, per Judge Silak, was 100% accurate in its assessment, and was so because time was taken to peruse the considerable amount of briefing, exhibits, and other documentation, in the do-

ing of which the Court of Appeals read and considered the leases which Farwell obtained from Mary Curl and Marian Basterrechea, significant parts of which have already been replayed in this opinion. These leases perpetuated the informal arrangement between the Schiewes and Farwell, that Schiewes would operate the lands owned by Farwell, Curl, and Basterrechea. Mrs. Schiewe's deposition reveals that leases were never discussed; the fact that this policy existed for seventeen years obviously caused the Schiewes to think that their right to remain on the land was inviolate. Just as obviously, this practice encouraged the Schiewes to pour their money and labor into fulfilling the CRP contract; why would they unless they would reap its rewards for the full contract term? The clear initiation of this practice, and the person clearly responsible for inducing the Schiewes' reliance, was Farwell. Of course the Schiewes voluntarily entered the contract, because it promised great gain for all parties, but they did so in reliance on the past practice of an informal and unspoken lease.

## PART II.

The dissenting opinion of Judge McDermott and the earlier opinion of the Court of Appeals, authored by then-Judge Silak, have made abundantly clear the manner in which Violet Schiewe was unconscionably treated by her neighbors, the Farwells, notwithstanding that the friendship of Violet Schiewe and William Farwell extended back to the time when they were grade school classmates. To date neither Mr. Farwell nor his attorney have stated or suggested any reason as justification for Farwell's actions toward Violet Schiewe after her husband died.[7] Judge McDermott's dissenting opinion illustrates Farwell's treatment of Violet Schiewe after her husband's death. It is particularly important to take note where Judge McDermott politely but firmly provides his readers with regard to the all-important *ten year contract* which had been entered into by both the Farwells and the Schiewes, joining together in a joint venture in order to do business with an agency of the federal government. Farwells did so as the owners/holders of lease rights on the patented lands of owners Mary Curl and Marian Basterrechea, together with their own personally owned large tracts of land. In essence it was a joint venture undertaken by the two families, a natural continuation of prior such ventures where the Farwells furnished the farm lands, as owners and holders of leases, and the Schiewes were the operators, i.e., the persons responsible for attending to all of the various and sundry mundane farm operations by which weeds are eradicated, seeds are planted, crops are raised and harvested, and then placed on the market.

Mrs. Schiewe, in undertaking that responsibility, was assisted by all of her nine children. When, at the taking of her deposition by Farwells' attorney, Mr. Parsons asked her the rather irrelevant and inane question, "Who, if anybody helped?" Mrs. Schiewe's ready answer, which has never been challenged, was that her help was all of her nine children. Asked if she paid wages, Mrs. Schiewe responded that she had five hired men, namely three of her sons, a son-in-law, and a grandson, all of whom were paid $1500 per month. Clearly, the entire family relied on the continuation of their leasehold.

The government contract which the two families executed clearly and legally placed them in a joint venture, whether so-called by them, or not, being of no moment. The government contract, although its primary purpose was to document the agreed arrangement as to what the government would pay in return for the Farwells' and the Schiewes' joint compliance therewith, was executed by the Farwells as owners/holders and by the Schiewes as operators,[8] both of

---

**7.** Logically, the only apparent answer is that he was activated by avarice and opportunity to increase his net worth. It was his misfortune that Violet Schiewe was well able to be the operator in charge of the farming operations which were contemplated under the federal government's Soil Bank Program, and it is beyond cavil that she did so, rather than signing the five year lease delivered to her by Mr. Parsons, who was an attorney dedicated to serving Mr. Farwell.

**8.** Both terms are of significance, in that the government contract, a printed form furnished by the government, requires that *there will be both*

whom being qualified, were accepted as operators under the provisions of the government contract. On Mr. Schiewe's death, Violet Schiewe became the sole operator as defined in the government's contract.

Mr. Farwell, who is an experienced businessman, seemingly became aware that if he could oust Violet Schiewe as operator, he might receive a larger share of the government's payment after fulfillment of the contract. Putting aside whatever may have been in his mind, he clearly was not acting in good faith when he retained an attorney to draw up a five year lease, which was mailed to Violet Schiewe by Farwell's attorney, with the request that she sign it, and return it to Farwell. The tone of the letter sounded more like a threat than a request, as discussed hereinafter.

Violet Schiewe was not only a competent operator in her own right, but equally as mentally astute as Mr. Farwell. On receiving the attorney's proposed five year lease with Mr. Farwell's signature already on it, duly acknowledged by a notary, she observed that the lease was for a term of only five years, and that missing therefrom was any suggestion that she would be given an extension. Violet Schiewe did not rise to the bait. Moreover, she was not unaware of the language in the federal government's printed contract form which on being signed, established that the Schiewes and the Farwells were engaged in and committed to what cannot be described as other than a joint venture.[9] A remarkable, knowledgeable woman, she readily comprehended that the signed government contract was a ten year commitment under which the Farwells were owners and holders of leases to the Curl and Basterrechea lands, and Violet Schiewe was the operator in charge of the farming operations. That arrangement necessarily was a joint venture, as it had to be in order to obtain the government contract. No operator, no government contract. No owner/landlord, no contract.[10] Apparently, the government pre-

---

an operator and an owner. Tenants and sharecroppers are likewise recognized as *participants* in the overall scheme of such farming arrangements. As explained below in Appendix A, "participant" may be a reference to the operator or the owner.

9. Mr. Farwell's ill-conceived scheme, to so tempt the recently widowed Violet Schiewe with the offer of a five year lease, was extremely unconscionable and does not commend itself to a court of equity. For a similar case of overreaching, *see Graves v. Cupic*, 75 Idaho 451, 456, 272 P.2d 1020, 1023 (1954). "[D]eeming it unnecessary, we do not further discuss the question of fraud. It is sufficient here to say that John Cupic, in making the representations or suggestions, which he says he did make, put himself in the position of representing to plaintiff that she could carry on the business in violation of the law, and of encouraging her to do so. §§ 23–910 [selling liquor without a license], 23–1010 [selling beer without a license], I.C. *Such conduct does not commend defendants' cause to a court of equity." Id.* (emphasis added). The parallel is obvious. John Cupic misled widowed Mrs. Graves by inducing her into a poor venture, but which enhanced his own purse. Similarly, William Farwell sought to induce the widowed Violet Schiewe into signing a five year lease, whereas she was better benefitted by the ten year CRP contract—a bird in the hand, as it were. Hers was a case of wisely fending for herself. Mrs. Graves, however, would not have fared very well in her dealings at the hands of John Cupic, other than for the Supreme Court granting her the relief which was denied to her by the trial court.

10. Both Irene Farwell and Violet Schiewe were accepted by the CCC as operators and were named signatories to the contract tendered by the federal government. The involved parties, the Schiewes and the Farwells, signed the Conservation Reserve Program Contract (CRP Contract) on the signature page and added the date of signing as follows:

| | |
|---|---|
| William A. Farwell | 2/9/87 |
| Irene Farwell | 2/9/87 |
| Mary H. Curl | 2/9/87 |
| H. Art Schiewe | 2/10/87 |
| Violet M. Schiewe | 2/10/87 |

The signature page was appended to the CRP Contract, *see* Plaintiffs' Exhibit 3, Record.

Defendants' Exhibit No. H is an additional signature page which was likewise appended and shows signing as follows:

| | |
|---|---|
| William A. Farwell | 2/9/87 |
| Irene Farwell | 2/9/87 |
| Larry Basterrechea | 2/9/87 |
| Mary H. Curl | 2/9/87 |
| H. Art Schiewe | 2/10/87 |
| Violet M. Schiewe | 2/10/87 |

Yet another page is part of the CRP Contract. It is prefaced with definitions identifying the parties to a CRP contract, and identifying them as being an "owner" or an "operator." The signatures and dates of signing on the contract appear as follows:

fers or requests that there be one of each. It is not unlikely that Mr. Farwell may have had in mind to induce the government officials into allowing him to be both operator and owner, but perhaps out of respect for Mrs. Schiewe and their long-time association, decided to forego pursuing that avenue.[11]

## PART III.

In another paragraph, the author of the opinion for the Court is seemingly grasping at straws:

> Because Schiewe and Farwells were permitted to enter into the agreement we must assume that some appropriate proof was presented to the CCC prior to entering into the contract. There is nothing, however, in the record before this Court which demonstrates what, if anything, Schiewe might have provided as independent evidence that she would operate the cropland for the contract period. We are left with only the evidence that she had been farming under a year-to-year oral lease from 1974 to 1987, and no new lease was signed before or after entering the CRP contract. Furthermore, the CRP contract does not provide for any of the standard lease provisions which we would expect to find in a document governing the possession of land, such as payment of property taxes, liability insurance and maintenance of buildings on the property.

125 Idaho at 50, 867 P.2d at 924 (1993). This paragraph reveals the precise flaw in the Court's opinion. Mrs. Schiewe does not argue that the CRP contract constituted a lease; rather, she argues that the CRP contract obviated the need for a lease and that she was justified in relying on Mr. Farwell's representations in signing the CRP contract. A lease would have been utterly superfluous.

4. Owners and Operators
 A. Irene Farwell SSN
 /s/Irene Farwell
 B. Violet M. Schiewe SSN
 /s/Violet M. Schiewe

The document shows that Irene Farwell signed it on February 9, 1987, and Violet Schiewe signed it on February 10, 1987. See the Prologue, above, for definitions applicable herein.

All of the foregoing sets the stage for one of the main issues which were litigated by the Farwells and the Schiewes, namely whether or not the

Schiewe and Farwell were both parties to the ten year contract. Significantly, the CRP contract, once executed by the parties and in place, "may not be revoked or revised unless upon mutual agreement between the *parties*," which is the exact language adopted and replayed in the opinion for the Court. Mrs. Schiewe, a party, clearly has not agreed to the revision of the contract that excludes her as an operator.

As discussed above, Mrs. Schiewe's deposition provides sufficient evidence that she would remain on the land as an operator. The federal government allows a change in operators, but grudgingly; it requires mutual agreement of *all* parties and discourages a change in operators by asking for proof of a ten year stint. Indeed, Section 2A(1), appended to this dissenting opinion, obviously desires the operator to fulfill the entire contract. Since an operator must *prove* that she will remain on the land for the *entire contract term,* a right to remain is clearly created.

The opinion for the Court asserts that: "Even if the CRP contract created some right to possess the real property, the doctrine [of past performance] does not apply to it because as a written document, the contract complies with I.C. § 9–505 and does not implicate the statute of frauds." This admission by the majority that the contract complies with I.C. § 9–505 illustrates that the government contract is a valid agreement because it is "in writing and subscribed to by all of the involved parties," namely both Schiewes who were recognized as operators, and by both Farwells, who were therein recognized as the owners, and by the Commodity Credit Corporation through two of its authorized representatives, Owen Zollinger and Don Wrigley, both of whom signed the

Schiewes and the Farwells were obligated to engage in a ten year joint venture. Clearly that was the intent of the CCC in setting the term of the contract at ten years. The Farwells signed their approval. Art and Violet Schiewe did likewise.

11. The stakes for entering into the venture were undoubtedly attractive, as evidenced by the government's regulation that the operator and the owner are each restricted to a $50,000 maximum.

contract on the same date, June 12, 1987. See plaintiff's exhibits 7 and 8, which are also denoted as deposition exhibits 3 and 6.

Relative to section 28 of the CRP contract, and the posited question, "What occurs if a term of the contract changes without the mutual agreement of the participants?" a question akin to vapid oratory, which one law professor at the University of Idaho College of Law admonished his classes to eschew—that was good advice, and remains so. Assuming that the "we" in the sentence which ensued is indicative of meaning "the Court," a ready answer to the inquiry is, as might be anticipated, that it depends on the federal government which initiated the Soil Bank Program. Section 28 of the government's CRP contract makes it clear that the government *is* in charge. It is the federal government, through one or another of its various agencies, which may or may not furnish an answer to the inquiry. Properly recognized is the observation that Violet Schiewe "had been farming under a year-to-year oral lease from 1974 to 1987." The ensuing phrase, "and no new lease was signed before or after entering the CRP contract," is undoubtedly correct, but of little value. One might put in hours, if not days, into speculating "what occurs if . . . ."

What *is* certain about the scenario laid before the Court is that Violet Schiewe, whether she did or did not have a written lease from the Farwells, nevertheless, on being recognized by the federal authority as an operator, attended faithfully to complying with the rules and regulations of the government. Not in the least a neophyte, and being a bona fide operator, she fulfilled her obligations to the government, and no one can say otherwise. However, it is said in the opinion for the Court that "We note that this case is before us as a declaratory judgment action to determine whether Schiewe has a right to remain on the land." That may so seem to others, but not to my understanding. Rather, a more astute view is, if that were an issue, then it was of a minor nature, and was enveloped by the larger issue, i.e., was Violet Schiewe—she being an accepted operator—without any right to remain on the very cropland which she had husbanded through-

out the full term of the ten year contract with the government in its Soil Bank Program which she was fully participating in following the demise. of her husband, H. Arthur Schiewe?

The answer is not needful of being written.

## APPENDIX A

The following definitions and terms are taken directly from the federal government's "Appendix to Form CRP–1, Conservation Reserve Program Contract" and have been referred to and used throughout the above dissenting opinion.

1. DEFINITIONS

. . . .

U. *Operator* means a person who is in general control of operations on the farm.

V. *Owner* means a person who has legal ownership of farmland including a person who is buying farmland under a contract for deed.

W. *Participant* means an owner, operator, or producer who has entered into this Contract with CCC.

. . . .

Y. *Producer* means a person who as owner, landlord, tenant, or sharecropper would have shared in the risk of producing the crop on the land to be placed in the CRP (or shares in the proceeds therefrom) as determined in accordance with 7 CFR Part 713.

2. ELIGIBILITY REQUIREMENTS

A. In order for any person to be eligible for payments under this contract, the person must be an owner or operator of eligible cropland and—

(1) if an operator of eligible cropland, must have operated the cropland for the period beginning not less than 3 years prior to the close of the applicable period for entering into the CRP Contract with CCC or January 1, 1985, whichever is later, and must provide satisfactory evidence that the person will operate the cropland for the contract period; or

(2) if an owner of eligible cropland, must have owned the cropland for not less than 3 years prior to the close of the

applicable period for entering into the CRP Contract with CCC, unless:

(a) the owner acquired the cropland by will or succession as a result of the death of the previous owners;

(b) the owner acquired the cropland prior to January 1, 1985; or

(c) The Secretary determines that the land was acquired under circumstances that give adequate assurance that the land was not acquired for the purpose of placing it in the CRP.

. . . .

3. AGREEMENT

A. The participants must:

(1) Place into the CRP for a period of 10 crop years from the date this Contract is executed by CCC the acreage of eligible cropland specified in item 5 of Form CRP-1 and the conservation plan, implement the conservation plan developed for such land, and carry out the terms and conditions of this Contract;

(2) Implement the conservation plan in accordance with the schedule of completion dates included in the conservation plan (the CCC may grant an extension of time for implementation of the conservation plan if as determined by CCC, the delay in implementation was caused by conditions beyond the participant's control);

. . . .

13. PARTICIPATION BY PARTNERSHIP

If the participant is a partnership, no payment will be made to the partnership until the social security numbers or employer identification numbers of all members of the partnership are furnished to CCC, together with a listing of the beneficial interest of each member in the partnership.

BISTLINE, Justice, dissenting on denial of petition for rehearing.

## PART I.

So that the interested reader may fully comprehend the vicissitudes of judicial gamesmanship and its effect upon the lives of ordinary mortal human beings, it is important to first make exceedingly clear what should have transpired and what should not have happened in the war waged in the courts of Idaho by the Farwells against the widow Violet Schiewe following the death of her husband H. Arthur Schiewe in July of 1987. Mr. Schiewe's untimely demise occurred after the Schiewes, together with the Farwells (who were landowners who had timely obtained leases from two other landowners, namely Mary Curl and Marian Basterrechea), all agreed to and did enter into written contracts with the Conservation Reserve Program (hereinafter CRP contracts). For further explanation of the Curl and Basterrechea leases, the interested reader should refer to footnote 5 of my dissenting opinion to this Court's decision, and to Judge Silak's Court of Appeals opinion, 125 Idaho 70, 867 P.2d 944.

That Violet Schiewe was recognized by the federal government as a qualified "operator" of the involved farm lands which were owned outright by the Farwells or leased by them from Curl and Basterrechea, has never been questioned. Of course she was. The interested reader will become fully informed by turning to the appended, well-written and comprehensive opinion of Justice Silak, authored in June of 1992, for the Idaho Court of Appeals, being joined by both Chief Judge Walters and Judge Smith, pro tem. Judge Peter McDermott, who participated *pro tem* with this Court on the petition for review of the Court of Appeals' opinion, and myself are in full accord with the content and verity of Justice Silak's opinion. Both of us highly endorse it as the singularly outstanding, informative, and wholly accurate opinion which it is. That opinion should have sufficed to dissuade Mr. Farwell from any further pestering of Violet Schiewe. In order that the interested reader may comprehend Justice Silak's opinion, it is published in 125 Idaho at 62, 867 P.2d at 936.

The controversy between Mrs. Schiewe and Mr. Farwell, a controversy for which there was no justification, served the unsalutory purpose of ending on a sad note a friendship of two elderly couples which had

existed for many, many years. For the two couples it was a reasonably remunerative arrangement. As the opinions of various members of the Court make quite clear, the Court is presently divided. The Chief Justice and Justices Trout and Johnson would affirm Farwell's conquest of the recently bereaved widow, Violet Schiewe. Judge McDermott, sitting *pro tem* at the Court's request, and I share the view that it is Mrs. Schiewe who should have been and should be the prevailing party in the district court and any subsequent proceedings. Justice Silak authored the first appellate decision which issued in this case, at that time being one of the three Court of Appeals judges. Her opinion was unanimously accepted. However, Farwell carried the controversy one more step, asking this Court to review the decision and opinion of the Court of Appeals. A majority of this Court did so, and inopportunely granted the Farwell petition for review.

Directing attention to the opinion authored by Justice Trout, the part therein which is singularly significant is in three paragraphs found 125 Idaho at 48, 867 P.2d at 922, which for the reader's ease are set forth herein:

> In 1987, Farwells decided to enter 2,214 acres of the land into a CRP contract with the federal government. This program provides reimbursement to farm owners and operators who desire to take certain ground out of production. The Schiewes were included in the contract as operators of the ground in question who desired to participate in the program. *The contract required that the participants place the land into the CRP program for a period of ten years.*
>
> After Mr. Schiewe died in July of 1987, his widow prepared the land by spraying for noxious weeds and planting grass seed pursuant to the requirements of the contract. Farwells and Schiewe split the cost of the seed and the herbicide and received partial reimbursement from the federal government. Schiewe paid for spraying of the land, repaired equipment and provided labor, for which she was not reimbursed.

Schiewe and Farwells divided the profits under the CRP contract according to the same terms as their previous sharecropping agreement. Farwells and Schiewe were each to receive about $50,000 per year after Curl and Basterrechea had been paid.

> In 1988, Farwells requested that Schiewe sign a five-year lease. Schiewe refused to sign the lease because she believed she had a right to remain on the land for ten years under the terms of the CRP contract. As a result, Farwells threatened to evict Schiewe as a holdover tenant and Schiewe brought an action in district court to determine if she had a right to remain on the land.

*Schwiewe v. Farwell,* 125 Idaho at 48, 867 P.2d at 922 (emphasis added). Other paragraphs of some applicability are found further on in Justice Trout's opinion:

> In this case, Schiewe contends she had a lease for the term of the CRP contract because she is the operator of the cropland. Although a lease or some proof of a continuing right to operate the ground is necessary to comply with the CRP contract, the contract itself does not create such a lease. By requiring 'satisfactory evidence,' it is clear that the contract contemplates that there must be some outside proof of the operator's right to continue to operate the land for the contract period.
>
> Because Schiewe and Farwells were permitted to enter into the agreement we must assume that some appropriate proof was presented to the CCC prior to entering into the contract. There is nothing, however, in the record before this Court which demonstrates what, if anything, Schiewe might have provided as *independent evidence that she would operate the cropland for the contract period.* We are *left with only the evidence that she had been farming under a year-to-year oral lease from 1974 to 1987, and no new lease was signed before or after entering the CRP contract.* Furthermore, the CRP contract does not provide for any of the standard lease provisions which *we would expect to find in a document governing the*

*possession of land, such as payment of property taxes, liability insurance and maintenance of buildings on the property.*

Consequently, *although Schiewe may be a party to the contract [which most assuredly is the fact of the matter], this contract does not create a right to remain on the cropland for the contract period where no independent right exists.* The provisions of the CRP contract specifically contemplate that owners or operators may change during the contract term. Section 26 states that a new owner or operator may become a participant in the contract if such a person assumes the obligations of the previous participants in the contract. Section 28 of the CRP contract states that the contract 'may not be revoked or revised unless upon mutual agreement between the parties.' Both of these provisions clearly anticipate that changes may occur, so long as all parties to the agreement concur. *We are left then with the question of what occurs if a term of the contract changes without the mutual agreement of the participants; such as the termination of the operator's tenancy.*

*Schiewe v. Farwell,* 125 Idaho at 50, 867 P.2d at 924 (emphasis added). The written contract, notwithstanding that Justice Trout feels obligated "to assume," exists, is nonetheless a validly executed contract executed between the CRP and the co-signing owner and operator. If either of them, or the CRP breaches the contract, it is done at their own peril. It is wholly unclear that it is "contemplated" that there must be "some," or any proof of the operator's "right" to operate the land. To the contrary, having signed the contract, the operator is obligated to performance thereof.

While one naturally regrets so saying, nothing in the questions raised in the three preceding paragraphs amount to any more than speculation as to what might be, or might not be.

What the Conservation Reserve Program has documented, by written contract, is that when H. Arthur Schiewe was accepted in the program, Violet Schiewe was also accepted. On his death she thereafter functioned and

performed her duties as an operator, assisted by all of her many and capable children. It is not readily understood why any member of the Court would conclude or urge that Violet Schiewe's signed acceptance as an operator authorized by the federal government for a contractual ten year period could or should give way to "the provisions of a year-to-year oral lease."

Not only did Violet Schiewe sign the government's contract, but it was also signed by, not one, but two authorized government representatives, Don Wrigley and Owen Zollinger. The result was a written contract binding on all of the signatories thereto, which included Violet Schiewe and William A. Farwell, as well as Mrs. Farwell. The Conservation Reserve Program Contact, as signed by William A. Farwell and Irene Farwell on February 9, 1987, and by H. Art Schiewe and Violet M. Schiewe on February 10, 1987, reads in full:

THIS CONTRACT is entered into between the Commodity Credit Corporation (referred to as 'CCC') and the undersigned owners and operators (referred to as 'Owner' and 'Operator,' respectively) on the farm identified above (referred to as 'Farm') for the fields and acres (referred to as 'designated acreage') identified in Items 8–17 below and on the CRP–1A Addendum, as applicable. The Owner and Operator agree to place the designated acreage into the Conservation Reserve Program ('CRP') for a period of 10 crop years from the date the Contract is executed by the CCC. The Owner and Operator also agree to implement on such designated acreage the Conservation Plan developed for such designated acreage and approved by the applicable local conservation district based upon the conservation practices identified in Items 10 and 15 below and in Items 4 and 9 on the CRP–1A Addendum or such other conservation practices as are identified in the Conservation Plan and agreed to by the Owner and Operator. The Owner and Operator and CCC agree to comply with the terms and conditions contained in this Contract and contained in the Appendix to this Contract, entitled Appendix to CRP–1, Conservation Reserve Program Contract (referred to as

'Appendix'). By signing below, each Owner and Operator acknowledges that a copy of the Appendix has been provided to the Owner and Operator and that the Owner and Operator has signed the last page of such Appendix which will be kept on file in the county Agricultural Stabilization and Conservation Service (ASCS) Office. By signing below, the Owner and Operator also agree to allow CCC a period of 30 days from the close of the applicable sign-up period to accept this Contract and agree to pay liquidated damages in an amount specified in the Appendix if the Owner and Operator do not allow CCC such 30–day period in which to execute this Contract.

In her Brief in Support of her Petition for Rehearing, Mrs. Schiewe, through her attorney, raises compelling arguments that highlight the shortcomings of the majority opinion.

Mrs. Schiewe first agrees with the conclusion of the majority opinion that "some appropriate proof" has to be "presented to the CCC prior to entering the [Conservation Reserve Program] contract." She points out, however, that since she had only a year-to-year lease, Farwell must have represented to the CCC, by either words or by his silence, that the Schiewes had the right to operate the farmland for the contract period.

Mrs. Schiewe then argues, and rightfully so, that the Farwells thereby misrepresented material facts and that they should be estopped from now asserting that Mrs. Schiewe does not have the right to operate the farmland for the contract period. Mrs. Schiewe signed the CRP contract in reliance on her right to remain on the land for the full ten years and incurred unreimbursed expenses *precisely because of* this reliance.

Even were the Farwells not responsible for such representations prior to signing the contract, the Farwells knew that the Schiewes had to provide evidence that they would operate the cropland for the full contract period. The Farwells thus waived their right and/or estopped themselves to thereaf-

ter assert that Mrs. Schiewe cannot so operate the cropland.

Furthermore, Mrs. Schiewe continues, it is manifestly unfair and in violation of the doctrine of part performance for the Farwells to have encouraged the Schiewes to sign the CRP contract and to incur expenses in furtherance of such contract, and then to refuse to continue the bargain.

Finally, Mrs. Schiewe points out that the majority opinion misapprehends the responsibilities of the parties to the CRP contract. The contract requires operators (usually, the tenant) to control the farming operations and to fulfill all terms and conditions of the contract, subject to liquidated damages. The majority opinion leads to the absurd result that Mrs. Schiewe, who can no longer work the Farwells' land, is now liable for such liquidated damages.

The majority, however, does not address these cogent arguments relating to estoppel, waiver, part performance, or the logical meaning of the CRP contract. Rather, the majority formulates an opinion that leads to confusion, mistreatment of farming tenants, and unnecessary complication of the CRP contracts, all of which will only serve to promote expensive litigation.

### PART II.

In contemplation of providing a dissenting opinion the task was made considerably more attractive by having at hand the views of the Honorable John Minor Wisdom, Circuit Judge of the Fifth Circuit, found in *Caulfield v. U.S. Department of Agriculture*, 293 F.2d 217, 222–29 (1961). Judge Wisdom in dissent was joined by Chief Judge Tuttle and Circuit Judge Rives. At the outset, it is important to keep in mind that the controversy examined in *Caulfield* was the same as the controversy engendered by William Farwell's mistreatment of Violet Schiewe following the demise of her husband, H. Arthur Schiewe.

Judge Wisdom noted in *Caulfield* that, "The controversy is between landlord and tenant." That was the same prevailing situation wherein William Farwell sought to oust Violet Schiewe from the share due her in her own right and the share due her from her

deceased husband. Judge Wisdom's dissenting opinion, in pertinent part, reads:

I respectfully dissent. I cannot believe that Congress intended the Soil Bank Act to be given the discriminatory effect denial of judicial review gives it in this case.

*The controversy is between landlord and tenant.* The majority opinion recognizes that the landlord would have the right to judicial review of administrative action depriving him of payments under his soil bank contract. But the Court bars judicial review to a tenant or sharecropper deprived of soil bank payments and as adversely affected by the ASC committee determination of no violation as the landlord would be affected by the determination there was a violation. This unfortunate limitation of review follows from an over-literal construction of the Act and the regulatory scheme for administration of the Soil Bank Program as denying judicial review except when the Secretary terminates a soil bank contract because of a violation of the contract. The effect of the holding is to ignore the practicalities and to work a serious injustice on tenants in Caulfield's sorry fix. When the Committee holds that the landlord has not violated the contract, there is no reason for him to go to the courts for relief: he is not hurt. But there may be very good reason, as in this case, for the tenant to appeal to the courts: he is deprived of his livelihood without compensation. The incongruity of the result is underscored by the fact that in most cases the tenant has a larger interest in the farming revenues than the landlord; here, for example, Caulfield is entitled to three-fourths of the farming revenues, and claims three-fourths of the soil bank payments, as against Coats's one-fourth. The incongruity is more anomalous when one considers that in the natural course of events appointments to ASC committees, which double as courts besides exercising an enormous influence in the administration of agricultural affairs, fall to large landowners and farm operators—not to tenants and sharecroppers.

I start with a presumption: '[I]n our system of remedies, an individual whose interest is acutely and immediately affected by an administrative action presumptively has a right to secure at some point a judicial determination of its validity. This is to me the teaching of our history and tradition. It is our common law, and in a lesser measure a corollary of our constitutions. I am well aware that this assertion can be criticized as a futile, an empty, a useless generality. I think on the contrary that it is an important proposition, and that if it is entertained by a court it may become a crucial factor in the decision to review.' Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401, 420 (1958).

In the Soil Bank Act Congress hammered out national policy after full consideration of the importance of protecting conflicting economic interests. *The Act shows clearly that Congress intended tenants and sharecroppers to have a fair share in the Soil Bank Program.* The legislative history of the Act shows congressional concern for fear landlords might do exactly what Caulfield charges his landlord did in this case. *The soil bank regulations of the Department of Agriculture show a conscious endeavor to carry out the congressional mandate of protecting the interests of tenants and sharecroppers, even though the implementation falls short of the Department's good intentions. Accordingly, in construing the Act and the regulations as permitting or denying a tenant the right of review, I find it easier to reach a result carrying out the congressional policy of giving tenants a fair shake than to reach a result frustrating that policy.*

The Court infers, here and in *Dickson v. Edwards,* [5th Cir., 1960, 293 F.2d 211], that since the Act expressly provides a procedure for review when there is an agency decision to terminate a contract, Congress intended to deny review of any other type of agency decision under the Soil Bank Act. I question that Congress held any such intentions. I infer simply that Congress felt that when a soil bank contract is terminated the procedural safeguards should be carefully outlined and the

producer should have the benefit of the now relatively uncommon right of review by trial de novo in the district court rather than limited review as to the substantiality of the evidence. But surely all other soil bank administrative action affecting producers is not immune from judicial scrutiny. The right of judicial review is too fundamental a safeguard in our system of law to be waived aside on such thin evidence of congressional intent.

The Court relies heavily on the 'finality' provision of the Act, 7 U.S.C.A. § 1809:

'The facts constituting the basis for any payment or compensation, or the amount thereof, authorized to be made under this chapter, when officially determined in conformity with applicable regulations prescribed by the Secretary, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government ...'

If we must adopt so narrow a construction that review may be had of a determination of a violation but not of a determination of no-violation, consistency in strict construction should require us to hold that the finality provision applies when there is payment but not when, as in this case, there is no payment (to the tenant). More importantly, I read Section 1809 as limited to fact-finding. Finality of fact-finding leaves the door wide open to court review for the purpose of determining if the agency correctly applied the law to the facts and acted within its authority. Cf. Aycock–Lindsey Corp. v. United States, 5 Cir., 1948, 171 F.2d 518; 5 Cir., [1951] 187 F.2d 117.

Assuming that in the proper case the finality provision might apply to a review of the facts, the provision seems inapplicable to the facts of the instant case, as the regulatory scheme is now constructed. The Act (7 U.S.C.A. § 1809) makes the finality of the agency decision contingent on the determination having been in conformity with 'applicable regulations prescribed by the Secretary.' But, the Act is silent and the Secretary has prescribed no applicable regulation for the administrative

problem this case presents: the procedure for administrative action and review when (1) there is a dispute between landlord and tenant as to the latter's right to participate in soil bank benefits and (2) there is an ASC committee determination that the landlord has not violated his soil bank contract. The tenant is not accused of a contract violation. And, he has no soil bank contract to be terminated.

Thus, even as to facts constituting the basis for the agency decision, there is no express preclusion of judicial review. Certainly, review should not be precluded by implication, contrary to the purposes of the Act. *Since the Act does not preclude judicial review and since the action is not committed to 'agency discretion,' the determination of the ASC committees, approved by the Secretary of Agriculture, is subject to review under Section 10(a) of the Administrative Procedure Act, 5 U.S.C.A. § 1009.* This section provides:

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law Committed to agency discretion.

(a) *Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.*"

As Congressman Walters said of Section 10: 'Legislative intent to forbid judicial review must be, if not [in] specific ... terms, at least clear and unmistakable.... The mere fact that Congress has not expressly provided for judicial review would be completely immaterial.' Sen.Doc. 248, 79th Cong., 2nd Sess., 368 (1946). The silence of Congress 'as to judicial review is not necessarily to be construed as a denial of the power of the federal courts to grant relief in the exercise of the general jurisdiction which Congress has conferred upon them.... Judicial review may indeed be required by the Constitution. *Ng Fung Ho v. White,* 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938. Apart from [the] constitutional requirements, the question whether judi-

cial review will be provided where Congress is silent depends on the whole setting of the particular statute and the scheme of regulation which is adopted.' *Estep v. United States*, 1946, 327 U.S. 114 [119–20], 66 S.Ct. 423, 426, 90 L.Ed. 567.

'Finality' is an illusion in most statutes. It is a mirage if relied on to preclude any judicial review of an administrative agency's decisions. *No legislative language can deprive a man of a fair hearing in the adjudication of his rights; or, of his right to have a court decide whether the administrative agency acted within its jurisdiction; and, whether the agency through a lay tribunal applied the correct rule of law to the facts.*

The law of administrative justice is still in a state of flux. The only common denominator of the decided cases I am able to discern is the broad principle, loosely applied, that *finality language will be whittled down to size to fit the Court's sense of fundamental fairness, whenever that sense is offended by denial of judicial review.* I do not say that the courts decide reviewability cases guided only by their own notions of abstract justice. If courts rationalize fair play in terms of 'jurisdiction,' 'statutory construction,' 'due process,' or some other legal concept it is always, I hope, in proper context, considering the circumstances of the case and the interplay of policy, statute, and regulation; reducing the subjective element by weighing the presence or absence of constitutional safeguards, the reasonableness of the regulatory scheme, the effectiveness of administrative relief, the adequacy of administrative check on initial action, the comparative qualifications of courts on the one hand or administrative tribunals on the other hand to decide the particular question at issue, the nature of the judicial review prayed for, the nature of the administrative action, and many other factors, some at cross-purposes.

The Attorney General finds a consistent principle running through the Supreme Court's holdings on reviewability. He finds that unreviewability is the order of the day when administrators deny the benefits to the beneficiaries of government programs, while reviewability follows when administrators enforce the obligations of government programs against those who are subject to the disadvantages of the Programs. This so called principle is of doubtful validity at best, but assuming its soundness when it is applied to a controversy between the beneficiary and the administrator—it should have no application when the controversy is really between two private persons over their share now in the government program.

*Congress created a right in tenants and sharecroppers to have a fair part in the Soil Bank Program.* Congress set up standards to protect that right. This case raises a serious question whether the Department of Agriculture departed from the standards set by Congress, in its regulations or in the administrative actions of its law courts, the ASC committees. This is enough to justify review, apart from any express or implied provisions of the Soil Bank Act allowing review, and even apart from Section 10 of the Administrative Procedure Act.

Congress has developed a startling and extraordinary insensitivity to politics, to economics, and to justice, and produced a strange out of character sort of law—if the Soil Bank Act locks the courthouse doors to tenants and sharecroppers seeking review of administrative action but unlocks and opens wide the courthouse doors to their landlords.

I would reverse the district court, and grant review.

*Caulfield v. U.S. Department of Agriculture*, 293 F.2d 217, 222–29 (5th Cir.1961) (footnotes 11 through 23 omitted) (emphasis added).

## CONCLUSION

Although pursuing this tome has been a time consuming endeavor, it is believed to be extremely important that all involved counsel and interested parties become informed that Mrs. Schiewe pursued a valid cause of action. Indeed, the *Caulfield* majority opinion acknowledged that a tenant, seeking relief such as Mrs. Schiewe sought, has "of course, . . . a

70

suit arising under a law of the United States." *Caulfield,* 293 F.2d at 222.

The Court of Appeals, per Judge Silak, was correct in the initial assessment of this situation which resulted in reversal of the district court's judgment. A declaratory judgment should have been, and still should be, entered estopping the Farwells, and their lessors (Mary Curl and Marian Basterrechea) from denying the existence of Mrs. Schiewe's right to remain as an operator for so long as she continues to be a party to the CRP contract, and further, that the landowners are precluded from terminating Mrs. Schiewe as an operator under the CRP contract, except as is or may be provided by the contract or by any applicable federal administrative remedies.

McDERMOTT, J. Pro Tem., concurs.